*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0114P (6th Cir.)
File Name: 02a0114p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____



DAVID VIRTS,
        *Plaintiff-Appellant,*

        *v.*

CONSOLIDATED
FREIGHTWAYS CORPORATION
OF DELAWARE,
        *Defendant-Appellee.*

No. 00-5501

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 98-00384 —Todd J. Campbell, District Judge.

Argued: September 14, 2001

Decided and Filed: April 4, 2002

Before: SILER and CLAY, Circuit Judges; GRAHAM,
District Judge.

_____

\*The Honorable James L. Graham, United States District Judge for
the Southern District of Ohio, sitting by designation.

1

---

**COUNSEL**

**ARGUED:** Larry L. Crain, LAW OFFICE OF LARRY L. CRAIN, Brentwood, Tennessee, for Appellant. David P. Jaqua, THE KULLMAN FIRM, Memphis, Tennessee, for Appellee. **ON BRIEF:** Larry L. Crain, LAW OFFICE OF LARRY L. CRAIN, Brentwood, Tennessee, Robert W. Ash, AMERICAN CENTER FOR LAW & JUSTICE, Virginia Beach, Virginia, for Appellant. David P. Jaqua, J. Wilson Eaton III, THE KULLMAN FIRM, Memphis, Tennessee, for Appellee.

---

**OPINION**

---

CLAY, Circuit Judge. Plaintiff, David Virts, appeals from the district court's judgment entered on February 25, 2000, denying Plaintiff's motion for partial summary judgment, and granting summary judgment to Defendant, Consolidated Freightways Corporation of Delaware, Plaintiff's employer, on Plaintiff's claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), for religious discrimination and retaliatory discharge. For the reasons set forth below, we **AFFIRM**.

**BACKGROUND**
**Procedural History**

Plaintiff filed suit on April 29, 1998, against Defendant seeking relief under Title VII for Defendant's alleged religious discrimination for failing to accommodate Plaintiff's religious beliefs. Plaintiff filed an amended complaint on May 13, 1998, adding a count for retaliatory discharge in violation of Title VII. Plaintiff filed a motion for partial summary judgment on January 14, 2000, and Defendant filed its motion for summary judgment on both claims on January 18, 2000.

251 (6th Cir. 1994) (finding that this Court may affirm the district court on any grounds supported by the record).

## CONCLUSION

The district court did not err in granting Defendant summary judgment on Plaintiff's claims of religious discrimination and retaliatory discharge, and we therefore **AFFIRM** the district court's judgment dismissing Plaintiff's claims.

In a memorandum opinion and order dated February 25, 2000, the district court granted Defendant's motion for summary judgment, denied Plaintiff's motion for partial summary judgment, and dismissed Plaintiff's suit. The district court entered its corresponding judgment, and Plaintiff thereafter filed a motion for reconsideration. The district court denied Plaintiff's motion for reconsideration, and Plaintiff filed this timely appeal.

### Facts

Plaintiff began working for Defendant on April 2, 1986, as what Plaintiff terms "an over-the-road truck driver," at Defendant's facility in Lincoln, Nebraska. Plaintiff transferred to Defendant's facility in Nashville, Tennessee, in October of 1995. Defendant's truck drivers at the Nashville terminal are represented by Local 480 of the International Brotherhood of Teamsters, and the terms and conditions of their employment are governed by the National Master Freight Agreement, Southern Supplement ("NMFA"). As described in the NMFA, Article 42, Section 4, the Nashville terminal uses a "call block" procedure for dispatching drivers on runs. Defendant has call blocks every three hours, beginning each day at midnight. When runs are available, Defendant's dispatcher calls the driver at the top of the list (i.e., the driver with the most seniority), tells the driver of the choice of runs available for that block, if there is more than one run, and dispatches the driver on the run. Under this system, the more seniority a driver has, the more choices he has from which to select regarding the run. However, according to Article 42 of the NMFA, if a driver is called by the dispatcher, a driver cannot decline to accept a run. If the dispatcher reaches the end of the call block before all of the runs are dispatched, he will draft drivers from the bottom of the call board and go up, in order of least seniority to highest, and place drivers in runs they did not request.

At all times relevant to the matter at hand, Plaintiff was what Defendant refers to as an "extra board driver." Out of all of Defendant's drivers, seventy-five percent of the runs

made out of Nashville are made by drivers who have bid to make specific types of runs such as sleeper runs; the other twenty-five percent of the runs are completed by drivers who have signed up for "extra board runs." Plaintiff belongs to the latter group of drivers. An extra board driver may be dispatched on three maintypes of runs: 1) a "turn run," meaning a run where the driver makes a delivery and returns to the Nashville terminal on the same day; 2) a "lay-down run," meaning a run where the driver has an overnight stay before returning to the home terminal; and 3) a "sleeper run," meaning a run where two drivers are dispatched in a sleeper truck. In addition, an extra board driver may place his name on a call block and restrict his availability by selecting a "no sleeper" on the board, meaning that he will accept all but sleeper runs, or by selecting "turn runs." Plaintiff did not place any restrictions by his name, inasmuch as, according to Plaintiff, refusing to do "sleeper runs" could significantly impact Plaintiff's income, particularly in slow periods. Moreover, Defendant agrees that just because a driver places a restriction by his name does not necessarily mean that he will never be required to make a sleeper run.

## A. Plaintiff's First Incident of Refusal to do a "Sleeper Run" with a Female

On or about December 28 or 29, 1995, Plaintiff received a telephone call from Dispatcher Danny Bennett dispatching Plaintiff on a sleeper run. Bennett gave Plaintiff a choice of two different sleeper runs, and Plaintiff chose the one with "Carter." When Plaintiff arrived at the Nashville terminal for the run, he asked who "Carter" was, and Plaintiff was informed that "Carter" was Linda Carter, a female. Plaintiff told Bennett at that time that he could not accept a dispatch on a sleeper run with a female driver because of his religious convictions. According to Plaintiff, having been "born again" as a Christian in 1963, it is against his religious beliefs to travel in this fashion with a female. Plaintiff claims that the Bible commands that a Christian should avoid the appearance of evil, and that when people see him on a sleeper run with a female, they either think that the two are husband and wife, or

establish that the proffered reason was a mere pretext by showing that 1) the stated reason had no basis in fact; 2) the stated reason was not the actual reason; or 3) the stated reason was insufficient to explain the defendant's action. *See Wheeler v. McKinley Enters.,* 937 F.2d 1158, 1162 (6th Cir. 1991). "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993) (emphasis in original); *see Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In its motion for summary judgment on this issue, Defendant did not dispute that Plaintiff had established a *prima facie* case of retaliatory discrimination, and focused its argument on the reason for Plaintiff's discharge – Plaintiff's dishonesty in connection with his altering the time on his pay sheet – claiming that no genuine issue of material fact remained for trial that this reason was legitimate and nondiscriminatory. Defendant argued, as it does on appeal, that because it held "an honest belief" that Plaintiff engaged in this dishonesty, Plaintiff could not establish pretext. In support of its claim, Defendant relied upon this Court's decision in *Smith v. Chrysler*, 155 F.3d 799, 806 (6th Cir. 1998), wherein the Court held that so long as the employer is able to demonstrate that it held an honest belief for its employment action, then the employee cannot establish pretext, even if it is later established that the employer's belief was mistaken. The district court agreed with Defendant, and it is this basis upon which the court granted Defendant summary judgment.

We need not reach the correctness of the district court's decision in this regard because Plaintiff filed a grievance regarding his discharge, and was subsequently returned to work by a grievance committee with his seniority, back pay, and retirement benefits restored. Thus, Plaintiff was made whole, and we agree that his claim was properly dismissed by the district court albeit for different reasons. *See City Management Corp. v. U.S. Chemical Co., Inc.*, 43 F.3d 244,

majorities as well as minorities." *See Hardison*, 432 U.S. at 81.

Therefore, where it has been found that the type of accommodation requested by Plaintiff would constitute an undue hardship on the employer without the consideration of seniority and a collective bargaining agreement, certainly Defendant in the matter at hand would suffer an undue hardship in attempting to accommodate Plaintiff inasmuch as Defendant has demonstrated that the proposed accommodations would affect seniority and the collective bargaining agreement. *See, e.g., id.* at 82 (finding that an employer is not required to carve out a special exception to its seniority system in violation of a collective bargaining agreement, in order to meet an employee's religious obligation).

## II.   RETALIATORY DISCHARGE CLAIM

Plaintiff next argues that the district court erred in granting Defendant summary judgment on Plaintiff's claim for retaliatory discharge.

Using the circumstantial evidentiary pathway to prevail on a claim for retaliatory discharge under Title VII, a plaintiff must first establish a *prima facie* case by demonstrating that 1) the plaintiff engaged in an activity protected by Title VII; 2) the exercise of the plaintiff's civil rights was known to the defendant; 3) the defendant thereafter undertook an employment action adverse to the plaintiff; and 4) there was a causal connection between the protected activity and the adverse employment action. *See Williams v. Gen. Motors, Inc.*, 187 F.3d 553, 568 (6th Cir. 1999); *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990). If the plaintiff demonstrates a a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Canitia*, 903 F.2d 1066. Once the defendant articulates its reason, the plaintiff, who bears the burden of persuasion throughout the entire process, must demonstrate that the proffered reason was a mere pretext for discrimination. *Id.*   The plaintiff may

they wonder what kind of "hanky panky" is going on. Plaintiff also believes that sleeper runs can lead to lustful thoughts and sexual temptation inasmuch as the drivers disrobe in the sleeper cab. Defendant, however, contends that because each sleeper tractor is equipped with a thick curtain hanging between the driver area and the sleeper area, if a driver chooses to disrobe at all, he or she can do it behind the privacy of a curtain.

Due to the time factor as well as the fact that another sleeper run team was leaving at the same time, someone representing Defendant and a Union representative made arrangements to switch loads, and told the individuals involved that they must get with the Local 480 Business Agent and the Dispatch Manager upon return to review work rules and contract procedures. Defendant contends that by allowing such a swap, the seniority provisions of the NMFA Article 42 were violated. Upon Plaintiff's return from his run, he was informed that the next time that he was paired with a female on a sleeper run dispatch, he must accept it.

### B.   Plaintiff's Second Incident of Refusal to do a "Sleeper Run" with a Female

On May 30, 1997, Plaintiff placed his name on the extra board for the 3:00 a.m. call block. Dispatcher Bennett called Plaintiff to dispatch him on a run, and told Plaintiff that the only run left was a sleeper run with "Savage." The "Savage" to whom Bennett was referring was Cindy Savage, one of Defendant's female drivers; however, Plaintiff claims that he did not realize that Savage was female until after he accepted the assignment and ended his conversation with Bennett. Plaintiff states in his complaint that he did not realize that Savage was female because during the conversation with Bennett, Plaintiff asked what was "his" name, meaning the name of the other driver, to which Bennett replied, "Savage," and partly because Plaintiff inquired as to whether "he" smoked, meaning the driver, to which Bennett replied that he did not know.

After Plaintiff realized that Savage was female, he telephoned Bennett and told him that he could not accept the dispatch because of his religious beliefs. Bennett, in turn, informed Plaintiff that he was required to make the run or he would be deemed to have voluntarily quit. Plaintiff did not report to make the run as dispatched; that afternoon, Dispatch Operations Manager Greg Heard called Plaintiff to tell him that a meeting had been scheduled on June 2, 1997 to discuss Plaintiff's failure to report for the run.

The meeting was held on June 2, 1997, as scheduled. Those in attendance included Plaintiff, International Brotherhood of Teamsters Local 480 Business Agent Jerry Seaborn, Union Steward Lloyd VanZandt, Nashville Terminal Manager Gary Tankersley, and Dispatch Operations Manager Heard. Plaintiff's pastor was also in attendance and explained Plaintiff's religious beliefs in connection with his refusal to go on sleeper runs with females. Plaintiff as well explained his religious beliefs regarding the matter; at the end of the meeting, Plaintiff was told that he would be notified regarding the final decision concerning his employment. Two days later, on June 4, 1997, Tankersley and Heard telephoned Plaintiff and informed him that Defendant's position was that Plaintiff voluntarily quit because Plaintiff failed to accept a dispatch on May 30, 1997. Defendant followed up with a letter to Plaintiff explaining that by Plaintiff's refusal to ride with qualified female drivers on sleeper runs, as well as Plaintiff's request to not to be asked to ride on sleeper runs with females in the future, Defendant was being forced "to discriminate and violate the seniority rights of [Plaintiff's] fellow employees." (J.A. at 266.) The letter concluded:

> Therefore, by being given prior notice on May 30, 1997, and follow-up meeting held on above listed date [June 2, 1997], you have been given more than one opportunity to reconsider your refusal of a dispatch. Consolidated Freightways considers this a voluntary quit for refusing to accept a dispatch when called. Your name is being removed from the seniority list in Nashville, Tennessee.

result of this proposed accommodation was an alteration of other employees' time off. *Id.* (citing *Lee*, 22 F.3d at 1023).

The *Weber* court also found that the employer's hypotheticals regarding the effects of the proposed accommodation were not too remote or unlikely, noting the law did "not require [the employer] to wait until it felt the effects of [the plaintiff's] proposal by foregoing a run or skipping over a female driver." *Weber*, 199 F.3d at 274-75 (citing *Beadle v. City of Tampa*, 42 F.3d 633 (11th Cir. 1995)). In addition, the *Weber* court found that the employer was not required to make an effort to accommodate the plaintiff, where any attempt at doing so would be fruitless inasmuch as the rights of other employees would be violated, and providing the accommodation would therefore pose an undue burden. *Id.* (citing *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 615 (9th Cir. 1988)).

Although *Weber* did not involve the role a collective bargaining agreement would play in relation to the proposed accommodation, *Weber* is on all fours with the matter at hand in all other relevant respects. As in *Weber*, any of Plaintiff's proposals to accommodate his religious belief against going on sleeper runs with females had the potential of adversely impacting other drivers inasmuch as the driver who would take Plaintiff's place may have actually received a less profitable run, or a run resulting in less rest and time off between runs. Therefore, seniority and collective bargaining agreements aside, *Weber* clearly shows that Defendant would suffer an undue hardship in attempting to accommodate Plaintiff's religious belief because Defendant's other employees were likely to be adversely affected by any accommodation. *See Weber*, 199 F.3d at 274 ("The mere possibility of an adverse impact on co-workers as a result of 'skipping over' is sufficient to constitute an undue hardship."). Indeed, "Title VII does not contemplate such unequal treatment. The repeated, unequivocal emphasis of both the language and the legislative history of Title VII is on eliminating discrimination in employment, and such discrimination is proscribed when it is directed against

We are further persuaded that the district court did not err in granting Defendant summary judgment on this issue by the Fifth Circuit's recent decision in *Weber v. Roadway Express, Inc.*, 199 F.3d 270, 275 (5th Cir. 2000). In *Weber*, the Fifth Circuit held that it was an undue hardship to require the employer, Roadway Express, to skip over a truck driver on a seniority board in order to accommodate one of its driver's religious beliefs that going on a sleeper run with a female was wrong. *Id.* There, the plaintiff truck driver, a Jehovah's witness, informed his employer, Roadway Express, that his religious beliefs prevented him from making sleeper runs with females other than his wife. *Id.* at 272. The sincerity of the plaintiff's religious belief appeared to be undisputed; however, the employer informed the plaintiff that "working with women was part of his job and that he would have to work with women or would not receive any driving assignment." *Id.* The plaintiff filed suit claiming religious discrimination under Title VII, and the district court granted the employer summary judgment on the basis that the employer could not reasonably accommodate the plaintiff's religious belief without undue hardship. The plaintiff appealed and the Fifth Circuit affirmed. *Id.* at 275.

In rejecting the plaintiff's proposed accommodation of "skipping over" the plaintiff when he would be paired with a female driver, the Fifth Circuit noted that this "skipping over" proposal may have had an adverse impact on the other drivers by sending one of them on a shorter – and therefore less profitable – run, as well as by providing the substitute driver with less rest and time off between runs. *Weber*, 199 F.3d at 274. Accordingly, the court held that "[t]he mere possibility of an adverse impact on co-workers as a result of 'skipping over' is sufficient to constitute an undue hardship." *Id.* (citing *Hardison*, 432 U.S. at 81). In support of its holding, the court analogized to *Lee v. ABF Freight System, Inc.*, 22 F.3d 1019, 1023 (10th Cir. 1994), wherein the Court of Appeals for the Tenth Circuit found that the "voluntary runaround" system proposed by the plaintiff as an accommodation for his religious belief against working on Saturdays constituted an undue hardship to the employer inasmuch as the unavoidable

(J.A. at 266.)

Plaintiff filed a grievance with the union concerning his discharge. Around June 19 or June 20, 1997, Union Business Agent Seaborn called Plaintiff and told him that the Union and Defendant were continuing to work on a solution to Plaintiff's religious objections. Seaborn claimed that although attempts were made to come up with a resolution, there was not any accommodation that could be made for Plaintiff which would not violate the seniority provisions of the collective bargaining agreement ("CBA" or "collective bargaining agreement") and the rights of other bargaining unit members. As the CBA representative, Local 480 would not agree to allow that to occur or to change any of the terms of the collective bargaining agreement. Despite this, the Union, Defendant, and Plaintiff all agreed that Plaintiff could return to work. The terms of the agreement were set forth in a letter to Plaintiff:

> It was agreed at this meeting that your "voluntary quit" letter dated June 4, 1997, would be reduced to a Final Letter of Warning. Along with this agreement, by all those attending, other agreements were:
>
> 1. You may return to work on June 20, 1997, 6:00 p.m. call block.
> 2. No back pay/ no benefits
> 3. Time served as a suspension.

(J.A. at 321; 386.) Pursuant to this agreement, Plaintiff returned to work.

### C.   Plaintiff Files a Title VII Religious Discrimination Complaint with the EEOC & the Tennessee Human Rights Commission

Plaintiff filed a Title VII Religious Discrimination Complaint with the EEOC and the Tennessee Human Rights Commission, and received a right to sue letter on or about January 30, 1998. Plaintiff filed his original Complaint in the

United States District Court for the Middle District of Tennessee on April 29, 1998.

### D. Plaintiff's Termination Allegedly for Falsifying his Pay Sheet

On January 28, 1999, Plaintiff was dispatched on a run to Evansvillle, Indiana and, upon return to Nashville, Plaintiff was dispatched on a run to Bowling Green, Kentucky. Plaintiff drove Defendant's tractor 10-643 to and from Evansville and drove tractor 10-2559, a new tractor, from Nashville to Bowling Green. Plaintiff arrived in Bowling Green at 0946 (measured in hundreths of an hour), or about 9:28 a.m. Plaintiff walked into the dispatch office, also called the driver salesman room, punched the clock, completed the paperwork, and handed it to Lana Young, who performs dispatch and clerical duties for Defendant's Bowling Green terminal.

Plaintiff waited in the room for local workers to unhook the trailer that he brought from Nashville. Plaintiff overheard two Bowling Green terminal drivers talking with Young about switching tractors for Plaintiff's return to the Nashville terminal. Plaintiff interjected in the conversation inasmuch as Plaintiff claims that they were going to switch his new tractor for one that had been having mechanical problems. Plaintiff claims that he was unsure as to whether the swap was going to be made.

About twelve minutes after Plaintiff had punched in, at about 0965 (measured in hundreths) or 9:40 a.m., Plaintiff claims that an unknown driver came to the salesman room and told Plaintiff that he was dropped and ready to go. Plaintiff claims that because he did not know that his original tractor had been switched, he wrote number 10-2559 of the original tractor on both his paysheet and the sign-out sheet; punched the clock; had Young initial his time spent at Bowling Green; and left to get the tractor and return to Nashville. Once outside, Plaintiff found his tractor still hooked up to the trailer that he had brought from Nashville. Plaintiff returned to the dispatch area and told Young that his

possible accommodations . . . ."); *see also Weber v. Roadway Express, Inc.*, 199 F.3d 270, 275 (5th Cir. 2000) (declining to embrace the plaintiff's claim that the employer's concerns regarding his religious accommodation were too speculative because they had yet to occur); *Beadle v. City of Tampa*, 42 F.3d 633 (11th Cir. 1995) (finding that the City did not have to accommodate the employee's religious belief on the basis of a concern that the accommodation would negatively affect the other employees).

Plaintiff also attempts to avoid summary judgment by claiming that under *EEOC v. Arlington Transit Mix, Inc.*, 957 F.2d 219, 222 (6th Cir. 1991), "[a]t a minimum, [Defendant] had an obligation to explore a voluntary waiver of seniority rights" before declining to accommodate Plaintiff. However, we are unpersuaded by Plaintiff's claim under *Arlington* inasmuch as that case did not involve a collective bargaining agreement and a seniority system, nor the concerns associated therewith. In other words, the array of concerns spoken of by the Supreme Court in relation to a collective bargaining agreement and the role it plays in determining whether a proposed accommodation rises to the level of an undue hardship were not present in *Arlington*. In addition, the record indicates that on two occasions Defendant held meetings in an attempt to accommodate Plaintiff, such that it cannot be said that Defendant never considered accommodating Plaintiff's religious beliefs. Furthermore, because Defendant's employees are represented by a labor organization, Defendant is prohibited from direct dealing with the employees thereby prohibiting Defendant from soliciting voluntary swaps of runs. *See, e.g.,* 29 U.S.C. § 159(a). Although Plaintiff attempts to vitiate this prohibition by relying upon *McDaniel v. Essex Int'l, Inc.,* 571 F.2d 338 (6th Cir. 1978), Plaintiff's attempt is in vain. As Defendant notes in its brief on appeal, *McDaniel* is of no moment inasmuch as the Court in that case did not address direct dealing with employees in an attempt to circumvent a collective bargaining agreement.

indication from Congress, we cannot agree with Hardison and the EEOC that an agreed-upon seniority system must give way when necessary to accommodate religious observances.

*Hardison*, 432 U.S. at 79 (footnote omitted). Indeed, the *Hardison* Court noted that "the strong congressional policy against discrimination in employment argues against interpreting the statute [Title VII] to require the abrogation of the seniority rights of some employees in order to accommodate the religious needs of others." *Id.* at 79 n.12. And so it goes that in the matter at hand, the district court properly found that where any of Plaintiff's proposed accommodations had the ability of violating the collective bargaining agreement by interfering with the seniority system, Defendant was not required to accommodate Plaintiff. *See id.*

Plaintiff attempts to distinguish *Hardison* by arguing that *Hardison* dealt with a junior employee possibly infringing on the seniority of a senior employee, while the only time that Defendant accommodated Plaintiff's religious belief was regarding driver Carter, who was junior to Plaintiff as was Carter's replacement. Therefore, according to Plaintiff, any claim that Defendant's collective bargaining agreement may be violated by affecting the seniority system is pure speculation. Plaintiff also makes much of the fact that since he began working at the Tennessee terminal, he has only asked for one accommodation, the one involving Carter, thereby adding to his contention that Defendant's claims are speculative. We disagree with Plaintiff's argument because it has been found that an employer does not have to actually experience the hardship in order for the hardship to be recognized as too great to be reasonable. *See Hardison*, 432 U.S. at 81 (finding that under Title VII, an undue burden is placed upon the employer if a proposed accommodation would force changes in the schedules of other employees, and alter the employer's otherwise neutral procedure); *Draper v. United States Pipe & Foundry Co.*, 527 F.2d 515, 520 (6th Cir. 1975) ("[I]t is possible for an employer to prove undue hardship without actually having undertaken any of the

tractor was still hooked to the original trailer; Young informed Plaintiff that he would be driving a different tractor back to Nashville. Plaintiff admits that he became argumentative with Young inasmuch as he was hoping to convince Young to let him return with the same tractor. Young explained that the other tractor needed to be returned to the Nashville terminal inasmuch as it was having trouble starting.

Plaintiff needed to switch his gear and perform any necessary pre-trip inspections before departing. He went outside, did what was needed to return to Nashville, came back, and punched the time clock a third time. Plaintiff started to fill out another line on his pay sheet to explain the additional time between his second and third punches, but stopped to ask Young how he should account for the extra time, inasmuch as she had previously signed his pay sheet. According to Plaintiff, Young told him that she did not know whether she could sign twice for the time, and that she did not care how he proceeded; Plaintiff could do "whatever." Plaintiff claims to have taken Young's comments as "permission" to change the time to accurately reflect the time that he spent at Bowling Green. Plaintiff scratched out the original time authorization, twelve minutes, and, according to Plaintiff, in Young's presence he changed the time authorization number to be nineteen minutes. Plaintiff returned to Nashville, turned in his pay sheet in the usual course, and went home.

According to Defendant, however, Young told Plaintiff that she had already signed his pay sheet, that Bowling Green was not responsible for any additional time, and that she would not sign the sheet again. Young claims to have directed Plaintiff to take it up with the Nashville office, and that Plaintiff became angry and argumentative. Young goes on to claim that after Plaintiff left, she called Heard at the Nashville terminal to advise him of how she handled swapping the tractors, and to make sure that she was correct in refusing to sign Plaintiff's pay sheet again. Heard allegedly told Young that she handled the situation correctly, and he transferred the

call to Payroll Supervisor Tom Brockman to inform him of the pay sheet incident. Young also spoke to Nashville Dispatcher Lenny Kroeger, as she usually does when the Bowling Green terminal swaps equipment with the Nashville terminal.

The next day, January 29, 1999, Brockman claims to have noticed that the time Young authorized on Plaintiff's time sheet had been altered. Brockman brought the discrepancy to the attention of Dispatch Operations Manager Keith Johnson; Brockman told Johnson of his conversation with Young the day before, and that Plaintiff had upset Young about receiving authorization for the extra time. Johnson, in turn, called Young and faxed her Plaintiff's pay sheet to specifically determine whether Young had authorized the changes. Young denied authorizing the changes, and Johnson told Young to document what had happened in connection with the matter. Young complied by sending Johnson an e-mail and a statement regarding the events that transpired on January 28, 1999.

Johnson continued his investigation into the matter, and eventually informed Terminal Manager Gary Tankersley that he had an apparent unauthorized change on a pay sheet, and then Johnson telephoned Dan Thomas, Assistant Director of Labor for Defendant. Thomas allegedly told Johnson that there appeared to be a NMFA Article 45 violation for dishonesty, and that if things seemed as they appeared, Plaintiff should be discharged. Thomas then examined the pay sheet, agreed that it had been altered, and told Johnson to proceed with the discharge.

At about 4:30 or 5:00 p.m. on January 28, 1999, Johnson, Tankersley, Heard, Hastings (Johnson's assistant), and Ron Hoffman (a union member and former steward), phoned Plaintiff at his home and had a conference call. Plaintiff claims that he never met Hoffman prior to meeting him over the phone during this conference call. Plaintiff told the men that he had altered his time on his pay sheet, and Plaintiff was

3. When it is Plaintiff's turn to be called during a call block and the dispatcher notes that Plaintiff will be paired with a female driver, the dispatcher would treat the Plaintiff as if he had declined the run due to illness, resulting in the Plaintiff's name being taken off the "extra board" for 24 hours.

4. Defendant would allow each driver at the Nashville terminal the opportunity to drop one dispatch per month when called for any reason he or she chooses.

(J.A. at 970)

As the district court found, any of the proposals which required Defendant to skip over Plaintiff or drop him from the list are not feasible because in the course of doing so, Defendant would be violating NMFA Article 42, which requires Defendant to dispatch drivers in order of seniority, inasmuch as any of the proposals may require a more senior driver to take Plaintiff's run. Thus, under *Hardison*, Defendant cannot reasonably make any of these suggested accommodations. Specifically, the *Hardison* Court opined as follows when viewing the significance of a collective bargaining agreement and seniority system in the course of determining whether an accommodation constitutes an undue hardship:

Hardison [Plaintiff] and the EEOC insist that the statutory obligation to accommodate religious needs takes precedence over both the collective-bargaining contract and the seniority rights of TWA's [Defendant's] other employees. We agree that neither a collective-bargaining contract nor a seniority system may be employed to violate the statute, but we do not believe that the duty to accommodate requires TWA [Defendant] to take steps inconsistent with the otherwise valid agreement. Collective bargaining, aimed at effecting workable and enforceable agreements between management and labor, lies at the core of our national labor policy, and seniority provisions are universally included in these contracts. Without clear and express

(citing 42 U.S.C. § 2000e-2(h)).  The Court went on to hold that "[t]hus, absent a discriminatory purpose, the operation of a seniority system cannot be an unlawful employment practice even if the system has some discriminatory consequences." *Id.* at 82.  Because the Court found no suggestion of a discriminatory intent in the employer's seniority system, the Court held that the employer "was not required by Title VII to carve out a special exception to its seniority system in order to help Hardison [the plaintiff] to meet his religious obligations." *Id.* at 83.

Here, Defendant claims that as in *Hardison*, any of Plaintiff's four belated proposals of accommodation – made for the first time in Plaintiff's motion for partial summary judgment in the district court – would have required Defendant to violate the seniority provisions of the collective bargaining agreement, the NMFA, and would therefore cause undue hardship.  We agree; however, before addressing Defendant's claim, we note that the fact that Plaintiff failed to request these accommodations from Defendant is in itself fatal to Plaintiff's claim. *See Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 319 (6th Cir. 2001) (finding that the plaintiff's disability discrimination "claims fail as [the plaintiff] did not request accommodation from [the defendant]").

Plaintiff's four proposed accommodations made to the district court are as follows:

1.    Plaintiff suggests that prior to beginning to make calls during any call block, the dispatcher should determine whether there is a possibility that the Plaintiff could be paired with a female driver on a sleeper run.  If so, the dispatcher should move the Plaintiff's name to the next call block before making any calls.

2.    When it is Plaintiff's turn to be called during a call block, and the dispatcher notes that Plaintiff will be paired with a female driver, the dispatcher would treat the Plaintiff as if he had not answered the phone, resulting in the Plaintiff's name being taken off the "extra board" for eight hours.

then discharged for dishonesty pursuant to Article 45 of the NMFA.

Plaintiff filed a grievance regarding his discharge, and was subsequently returned to work by a grievance committee with his seniority, back pay, and retirement benefits restored.

This Court reviews a district court's order granting summary judgment *de novo*. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 1998).  Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

## I. RELIGIOUS DISCRIMINATION CLAIM

Plaintiff argues that the district court erred in granting Defendant's motion for summary judgment on Plaintiff's claim of religious discrimination because questions of fact remain for trial as to Plaintiff's sincere religious belief, and whether that belief could have reasonably been accommodated by Defendant.

### A.    Establishing a Claim for Religious Discrimination Under Title VII

Title VII of the Civil Rights Act of 1964, as amended in 1972, makes it unlawful for an employer to discriminate against an employee on the basis of religion.  42 U.S.C. § 2000e-2(a)(1).  Specifically, the statute provides that it is unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion[.]" *Id.* The term "religion" as used within Title VII includes "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue

hardship on the conduct of the employer's business."   42 U.S.C. § 2000e(j).   "To require an employer to bear more than a *de minimis* cost in order to accommodate an employee's religious beliefs is an undue hardship."   *Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1378 (6th Cir. 1994) (citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977)).

"The analysis of any religious accommodation case begins with the question of whether the employee has established a *prima facie* case of religious discrimination."   *Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1085 (6th Cir. 1987).   To establish a *prima facie* case, a plaintiff must demonstrate that 1) he holds a sincere religious belief that conflicts with an employment requirement; 2) he has informed the employer about the conflicts; and 3) he was discharged or disciplined for failing to comply with the conflicting employment requirement.   *Id.*   Once the plaintiff has established a *prima facie* case, the burden shifts to the defendant employer to show that it could not reasonably accommodate the employee without undue hardship.   *Id.*; *see also Cooper,* 15 F.3d at 1378.   "The reasonableness of an employer's attempt to accommodate is determined on a case-by-case basis."   *Cooper*, 15 F.3d at 1378.

### B.   Whether Plaintiff Established a *Prima Facie* Case of Religious Discrimination

The district court found that a genuine issue of material fact remained for trial as to the sincerity of Plaintiff's religious belief regarding sleeper runs with females, and therefore declined to grant Defendant's motion for summary judgment on the basis that Plaintiff had failed to present a *prima facie* case.   In other words, the district court found that Plaintiff had marshaled evidence regarding the sincerity of his religious belief for purposes of making a *prima facie* case.   As a result, it is unclear as to why Plaintiff argues extensively in his brief on appeal as to the sincerity of his religious belief.   The sincerity of his religious belief was not the basis upon which the district court granted summary judgment.   Rather, the court found that Plaintiff adduced sufficient evidence of his

sincerity for purposes of a *prima facie* case, and focused its decision on whether Defendant could reasonably accommodate Plaintiff without undue hardship.   Accordingly, we shall do the same.

### C.   Whether Defendant Could Have Reasonably Accommodated Plaintiff's Religious Objection to Going on Sleeper Runs with Females Without Undue Hardship

The district court concluded that Defendant could not have reasonably accommodated Plaintiff's religious objection to going on sleeper runs with females inasmuch as "accommodating the Plaintiff's religious conflict will result in a violation of the seniority provisions of the collective bargaining agreement, and affect the shift and job preferences and contractual rights of other employees."   (J.A. at 17.) Relying upon *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977), the district court concluded that such an accommodation constituted an "undue hardship" and was therefore not required by Title VII.

In *Hardison*, the Supreme Court looked at seniority systems as they relate to an employer's attempt to reasonably accommodate an employee's sincere religious beliefs.   *See Hardison*, 432 U.S. at 81.   In the course of doing so, the Court noted that to accommodate the plaintiff's claim – that the employer discriminated against the plaintiff on the basis of his religion in failing to provide the plaintiff with Saturdays off – the employer would have had to violate its seniority system. *Id.*   The Court then opined that it "would be anomalous to conclude that by 'reasonable accommodation' Congress meant that an employer must deny the shift and job preference of some employees, as well as deprive them of their contractual rights, in order to accommodate or prefer the religious needs of others, and we conclude that Title VII does not require an employer to go that far."   *Id.*

The Court further opined that its conclusion was supported by the fact that seniority systems are afforded special treatment under Title VII itself.   *See Hardison*, 432 U.S. at 81