**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0853n.06
Filed: December 14, 2007

**No. 06-4227**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

KELLY REYNOLDS and LINDA HEINE, )
)
    Plaintiffs-Appellants, )
)
        v. )
)
EXTENDICARE HEALTH SERVS., INC., )
and MILFORD CARE LLC d/b/a ARBORS OF )
MILFORD, )
)
    Defendants-Appellees. )

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

_____

BEFORE: BATCHELDER, COLE, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Plaintiffs Kelly Reynolds and Linda Heine brought suit against their former employer claiming they were retaliated against for reporting separate acts of offensive behavior. Their suit alleges violations of Title VII and Ohio common law. For the reasons that follow, we affirm the district court's grant of summary judgment for defendants.

I.

Plaintiffs originally filed this matter in the Court of Common Pleas in Clermont County, Ohio, but defendants removed the case to the United States District Court for the Southern District of Ohio pursuant to 28 U.S.C. §§ 1441 and 1446. The district court had jurisdiction pursuant to 28

U.S.C. § 1332. This court has jurisdiction to review the final judgment of the district court pursuant to 28 U.S.C. § 1291.

II.

Plaintiffs Kelly Reynolds and Linda Heine are registered nurses who were employed by defendants Extendicare Health Services, LLC and Milford Care LLC d/b/a Arbors of Milford. Extendicare is the parent company of Milford Care LLC, which operated a health care facility in Clermont County, Ohio, called the Arbors of Milford.

A.

Reynolds was hired as the Assistant Director of Nursing at the Arbors on June 12, 2003. She received an Employee Handbook that stated that her employment was at-will and that the handbook was not an employment contract. Reynolds signed an acknowledgment stating that she read the Handbook and understood that "[t]his handbook and the policies contained herein do not in any way constitute, and should not be construed as, a contract of employment between the employer and the employee, or a promise of continued employment." Reynolds served under Norma Nagel, the Director of Nursing, who reported to Jennifer Eiswerth,[1] the Arbors Administrator.

The Arbors gave Reynolds her first written performance evaluation on October 3, 2003. She received a rating of 74 out of a possible 100 points. Reynolds was not satisfied by the results of the report; she viewed it as being so negative that it "broke [her] heart to look at it." The report listed

---

[1]During the time that Reynolds worked at the Arbors, Jennifer Eiswerth was known by her maiden name, Jennifer Fehn. By the time of her deposition she had married. Throughout this opinion we will refer to her by her married name of Eiswerth.

five specific comments under the heading "[a]reas where improvement is needed": (1) think and react as a "manager," (2) learn to separate from clinical vs. manager duties and from other departments, (3) accepting direction, (4) takes things too personally, and (5) needs to stop "gossip." Following the performance evaluation, the Arbors provided Reynolds with a written detailed description of the Assistant Director of Nursing position. Reynolds signed it, and the Arbors coached Reynolds regarding how to better perform her job.

In January 2004, Eiswerth asked Reynolds to develop a written list of goals, both for her professional development and for her department. In March, Bonnie Jones took over as Director of Nursing, making her Reynolds' immediate superior. Jones believed that Reynolds was continuing to exhibit the behavior noted in her previous performance evaluation. Jones discussed the matter with Eiswerth, and they decided to present their concerns to Reynolds in the form of a 30-day Performance Improvement Plan ("PIP"). The PIP contained a list of areas in which Jones and Eiswerth believed Reynolds needed to improve. Jones drafted this list on April 26, 2004.

On May 5, 2004, Reynolds and others attended a meeting with a State of Ohio surveyor regarding the Arbors' facility accreditation survey. Reynolds discussed an issue with the surveyor after the meeting, and the surveyor gave her his business card.

Carolyn Puckett, one of Extendicare's regional consultants, observed this conversation and asked another employee, Valerie Day, "why the hell does she need a business card for?" Puckett then made a sexual hand gesture simulating masturbation. Both Day and Reynolds saw Puckett's

gesture. In her deposition, Day stated that "[t]he only interpretation that could be made from this was [Reynolds] was jerking this man off."

Extendicare has an Offensive Behavior Policy as part of its Employee Handbook. The policy directs employees to report violations of the policy and states that the company will not tolerate retaliation against those who report such violations.

Reynolds reported the gesture to Eiswerth on May 6, 2004; Day reported the gesture later that day. Eiswerth obtained written statements from both Reynolds and Day, and on May 10th, Reynolds, Day, and Eiswerth participated in a telephone conference with Jason Hohlefelder, Extendicare's Regional Director. Hohlefelder apologized for Puckett's behavior and said that Puckett would be disciplined and would not return to the Arbors facility. Puckett's employment ended, although the record does not contain any details surrounding her separation from the company.

On May 12, 2004, Eiswerth and Jones held a meeting with Reynolds and presented her with the PIP. The terms of the PIP required Reynolds to meet with Jones and/or Eiswerth weekly, or as needed to review her progress. The PIP also stated that Reynolds' failure to meet its goals could result in disciplinary action, including termination of employment. Jones and Eiswerth continued to be unsatisfied with Reynolds' performance. On May 28, 2004, they met with Reynolds and gave her another document that specifically described their concerns about her performance. Jones and Eiswerth reviewed Reynolds' proposed plan for implementing the PIP but rejected it because it shifted too much responsibility from Reynolds to Jones. Jones and Eiswerth told Reynolds to revise her plan and present them with a new one the following morning. She did not meet this deadline.

On June 4, 2004, the three of them met again. Jones and Eiswerth explained that Reynolds had not made significant progress toward the goals outlined in the PIP and had not provided them with an adequate action plan to show how she planned to meet these goals. Reynolds asked if she would be able to achieve the PIP goals within the 30-day period, and Eiswerth responded that she did not think it was possible to do so because Reynolds had not made significant progress during the last few weeks. Eiswerth then terminated Reynolds' employment.

In his deposition, Hohlefelder said that it was unusual to fire an employee as the first disciplinary measure in the absence of gross misconduct. He also stated that it was unusual to fire someone for not meeting the goals of a PIP before the PIP period had expired. He said that Eiswerth and Jones fired Reynolds because she had become a "disruption."

B.

Linda Heine began work at the Arbors as a Unit Nurse Manager on February 6, 2003. Her first performance review was generally positive, but two items were listed as needing improvement:

1. Remember to remain calm under stress – easily excitable

2. Refrain from gossiping or [complaints offered] in public areas.

Heine was placed on a 30-day PIP on April 26, 2004, because Arbors management believed she needed to improve her attitude and refrain from making negative comments about her fellow employees. She successfully completed the PIP but was told that there would be consequences if she reverted to having a negative attitude or made further negative comments about her colleagues.

Debbie Martin, a nurse aide who reported to Heine, told Heine on June 18, 2004, that John Jones, a male nurse, grabbed her buttocks and made a vulgar gesture symbolizing oral sex. John Jones is married to Bonnie Jones, the Director of Nursing. Martin asked Heine not to report the incident, but Heine informed her that she was required to do so by the Employee Handbook. Eiswerth was on vacation at the time, so Heine reported the matter to Bonnie Jones. Jones referred the matter to Assistant Director of Nursing Rodney Bradford and Hohlefelder.

Heine states that upon returning from vacation, Eiswerth told her that "there's no love for you here anymore." Heine stated further that Jones made Heine leave a training session for nurses, excluded her from other training opportunities, and reviewed her floor with greater scrutiny.

On August 17, 2004, Heine had a discussion during a break with Randall Gordon, a nurse and new employee. Heine warned Gordon about being seen with her, "if you want to stay around here very long, don't come and take lunch and breaks with me. They don't like me. They've made it clear and told people to stay away from me. So if you want to survive, don't come hang around me." Gordon asked Heine why she did not apply for the Assistant Director of Nursing position. Heine replied that management did not like her because she reported a situation between an aide and a nurse who was related to a director. Heine insists that she did not use names, but admits that she discussed the event with enough specificity to identify the people involved.

Gordon reported the conversation to Eiswerth. He accused Heine of disclosing confidential information, as well as making derogatory remarks about men in general. Gordon stated that Heine told him, "I never met a smart man before, until I met you." Gordon wrote that Heine told him that

she "showed up here to work to make the managements [sic] life a 'pain.'" Gordon stated that "[i]t also made me feel very uncomfortable for a unit manager to think of men as being idiots and morons . . . ." Eiswerth had a conversation with Heine and asked her why she was "bad-mouthing" Jones and why she told Gordon about Martin's complaint.

Following this conversation, Eiswerth decided to terminate Heine's employment because she had previously been warned about gossiping. Furthermore, the disclosure of confidential information was listed in the Employee Handbook as a Class III offense that justified termination. Heine took the next few days off work, so Eiswerth did not get the opportunity to terminate her employment until Monday, August 23rd. During her time off, Heine called Extendicare's corporate hotline and complained that she was being retaliated against for reporting the Martin incident. On August 23, 2004, Eiswerth gave Heine a written termination notice.

C.

Plaintiffs filed suit in the Court of Common Pleas in Clermont County, Ohio. Their complaint had four counts: (1) defendants breached an implied contract created by their Offensive Behavior Policy in violation of Ohio common law, (2) defendants' actions constituted a "violation of the doctrine of promissory estoppel in violation of Ohio common law," (3) defendants illegally retaliated against plaintiffs in violation of 42 U.S.C. § 2000e-3 and OHIO REV. CODE §§ 4112.09 and 4112.99, and (4) "wrongful termination in violation of the public policy of the state of Ohio."

Defendants removed the case to the United States District Court for the Southern District of Ohio. Defendants then filed two motions for summary judgment, one each for Reynolds and Heine.

The district court granted summary judgment for defendants on all counts. Plaintiffs timely appealed.

III.

We review the district court's grant of summary judgment de novo. *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 374 (6th Cir. 2007). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party has the burden of proving the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met its burden, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). When determining whether the nonmovant has met this burden, we must view the evidence in the light most favorable to the nonmoving party, and that party must be given the benefit of all reasonable inferences. *Smith Wholesale Co., Inc. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 861 (6th Cir. 2007).

IV.

In order to establish a prima facie case of Title VII retaliation, a plaintiff must show that: (1) she engaged in activity protected by Title VII; (2) her exercise of protected rights was known to defendants; (3) defendants took adverse employment action against the plaintiff; and (4) there was

a causal connection between the protected activity and the adverse employment action. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000). If the plaintiff establishes a prima facie case, then the burden shifts to the employer to show that it had a legitimate, nondiscriminatory reason for the adverse employment action. *Virts v. Consol. Freightways Corp.*, 285 F.3d 508, 521 (6th Cir. 2002). Once the employer presents such a reason, the burden then shifts back to the plaintiff to show that the employer's proffered reason is a pretext for discrimination. *Id.*

Defendants conceded the first three elements of the prima facie case before the district court but argued that Reynolds had not established a causal connection between protected activity and termination of her employment. The district court agreed and granted summary judgment for defendants on this claim because it found that "Reynolds cannot make the connection between her termination and the report of offensive behavior that she filed."

To establish the causal connection element, "a plaintiff must proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) (internal quotation marks and citation omitted). Reynolds' primary argument is that the temporal proximity between her protected conduct and the adverse employment action is legally sufficient to establish causation. She notes that she was placed on the PIP two days after reporting the offensive gesture and that she was terminated three weeks later. She then cites *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001), *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004), and *Singfield v. Akron Metro Housing Auth.*, 389 F.3d 555, 563

(6th Cir. 2004) for the proposition that "[w]here the temporal proximity between a protected activity and an adverse action is 'very close,' it is <u>alone</u> sufficient to establish causation."

Our examination of these cases reveals that they do not support Reynolds' argument. *Breeden* involved a retaliation claim brought by a school district employee. The plaintiff argued that she was punished by being transferred after reporting harassing conduct. *Breeden*, 532 U.S. at 271-72. The school district presented evidence that the transfer had been planned prior to plaintiff's protected activity, and the Supreme Court refused to allow the transfer to be used to establish the required causal connection. *Id*. at 272. The Supreme Court held that "[e]mployers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Id*.

In the present case, the district court used a similar rationale for granting summary judgment for defendants. The court noted that defendants submitted unrebutted evidence showing that Eiswerth and Jones intended to place Reynolds on the PIP approximately one week before she reported the Puckett gesture. Applying the *Breeden* rationale, it is not appropriate to view placing Reynolds on the PIP as being causally related to her filing of the complaint because the PIP decision had been made prior to the protected action.

In *DiCarlo*, 358 F.3d at 421, we found that "*in certain distinct cases* where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to

arise." *Id*. (emphasis added). In *DiCarlo*, the plaintiff was a postal employee who filed an EEO complaint against the Postal Service. *Id*. The decision to terminate the plaintiff came thirteen days after he filed his complaint, and he was terminated twenty-one days after he filed the complaint. *Id*. Because the decision to terminate and the actual termination both happened shortly after the plaintiff engaged in protected activity, the court allowed this fact to serve as indirect evidence of a causal connection. *Id*.

The present case involves a different timing of events. Here, defendants had decided to place Reynolds on the PIP before she engaged in protected activity. We have recently reiterated the general rule that "temporal proximity itself is insufficient to find a causal connection . . . ." *Michael v. Caterpillar Financial Serv. Corp.*, 496 F.3d 584, 596 (quoting *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006)). We noted that, although temporal proximity alone is not sufficient to establish a causal connection, "a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection." *Id*.

Reynolds attempts to meet this standard by offering two facts that she alleges would allow a reasonable jury to infer a causal connection: (1) Extendicare testified that Reynolds was fired "because Ms. Jones could not work with her anymore and because she had become a disruption;" and (2) Day "was *also* subjected to retaliatory treatment from Ms. Jones and Ms. Eiswerth after the complaint."

Regarding the first fact, Reynolds argues that the district court ignored the record which established that Jones told Reynolds that she was improving on the day she was fired, but would still

be fired because Jones could not work with her anymore. Reynolds also notes that Hohlefelder testified that Reynolds was terminated because she had become a "disruption." But Reynolds does nothing more than suggest that these facts somehow create a causal connection. She does not develop the argument and does not show *how* these facts establish the causal element of her retaliation claim. Furthermore, the portion of the record that Reynolds cites for the proposition that Jones said she was improving does not support her assertion. Reynolds claims that Jones told her she was improving. But the conversation that she cites in the record involves Jones telling Reynolds that her attempts to develop an action plan in response to the PIP are improving – Jones did not say that Reynolds' overall job performance was improving.

Her second factual claim is that Day was also retaliated against, presumably for her role in reporting the Puckett gesture. Day apparently had to suffer the following acts of retaliation: (1) Eiswerth began treating her "unfavorably" at department meetings, (2) Eiswerth spoke to her in an "unpleasant" tone, (3) Eiswerth rolled her eyes "so as to give Ms. Day the impression that Ms. Eiswerth did not like her," and (4) Eiswerth gave Day a "low evaluation which Ms. Day felt was unwarranted . . . ." Day was apparently so disturbed by these events that she complained to the Extendicare corporate hotline. We need not decide whether these actions constitute retaliation against Day because she is not a party to this case. But even if these acts of rudeness qualify as retaliation against Day, plaintiffs fail to show how these facts constitute retaliation against Reynolds.

Reynolds argues that the district court erred by considering defendants' non-discriminatory reason while evaluating the merits of the prima facie case. Our analysis of the district court's

opinion shows that its actions were entirely warranted. The district court reviewed Reynolds' prima facie case, found that she could not establish the causation requirement, and then ruled in the alternative that even if she could establish it, she could not show that defendants' non-discriminatory reason was pretextual. This was not error by the district court.

Finally, Reynolds asserts that a reasonable jury could find that defendants' proffered explanation was simply a pretext for discrimination. The district court rejected this argument by noting the unrebutted testimony describing Reynolds' below-average job performance. The failure to establish a causal connection is dispositive. Because we hold that Reynolds cannot establish a prima facie case, we need not determine whether she could carry the burden of proving pretext. We affirm the district court's grant of summary judgment in defendants' favor regarding Reynolds' retaliation claim.

V.

The district court found that Heine had established a prima facie case of retaliation. Defendants conceded the first three elements of retaliation, and the district court found that there were enough facts in the record from which it could infer causation. Nevertheless, the district court granted summary judgment for defendants regarding Heine's retaliation claim because it determined that Heine was unable to show that defendants' legitimate, non-discriminatory reason for firing her was pretext. This is the basis for Heine's appeal.

In order to establish that an employer's proffered reason was pretext, a plaintiff must show that: (1) the reason had no basis in fact, (2) the stated reason was not the actual reason, or (3) the stated reason was insufficient to explain the defendant's action. *Virts*, 285 F.3d at 521.

The district court noted that the conversation that Heine had with Gordon involved the same sort of behavior that Heine's superiors had warned her against in the past. Defendants had been so concerned about Heine's gossiping, negative attitude, and negative comments that they warned her about this behavior on several occasions prior to her protected conduct and even placed her on a PIP to attempt to correct her behavior. The district court viewed Heine's conversation with Gordon as "the same sort of behavior that the record shows her supervisors had sought to correct on many occasions."

Heine bases her appeal on three arguments: (1) a reasonable jury could find that she did not disclose confidential information, (2) her discussion with Gordon was insufficient to terminate her employment, and (3) a reasonable jury could find that the Gordon incident did not actually motivate her termination.

Heine argues that a reasonable jury could find that she did not disclose confidential information in her discussion with Gordon. She argues that the district court erred by resolving two issues of fact against her. She claims that she did not disclose any of the specifics of her complaint with Gordon and that, even if she did disclose the details of her complaint, it is not against Extendicare policy to do so. This argument is rebutted by Heine's own testimony.

According to Heine's deposition testimony, Gordon asked her why she did not apply for the Assistant Director of Nursing position. She replied,

> [W]ell, management doesn't like me very much anyway. And I said the fact that I reported a situation between an aide and a nurse. And I said, unfortunately the nurse was related to the director. They really don't like me. I did not give names. I did not give particulars on an incident.

When asked if she identified the director by name, Heine replied "I'm sure I didn't give anybody's names. There would have been no reason to give names." There would have been no reason to give names because Bonnie Jones was the Director of Nursing and she is the only director that Gordon would have known.

Heine argues that there is "no Extendicare policy or procedure [that] specifically precludes an employee from discussing a complaint of offensive behavior or identifies it as 'confidential.'" The Extendicare handbook designates the act of "disclosing any confidential information concerning other employees, residents/patients, or the facility" as a Class III offense. In the Employee Handbook, the section describing Class III offenses is introduced with the following warning: "An employee will be discharged if an investigation reveals they have committed a Class III infraction." Given the unambiguous language in the handbook, Heine cannot reasonably claim that it is not against company policy to disclose confidential information. The handbook does not specifically define allegations of sexual harassment as confidential, but we have no problem concluding that this is a matter of common sense.

Heine's argument does not help her cause. At best, she was engaging in the sort of gossip and negative statements that she had previously been warned against making, and, at worst, she was

improperly disclosing confidential information. Neither of these possibilities supports her argument that the proffered reason was in fact a pretext and she was actually fired in retaliation for her having filed the sexual harassment accusation.

Heine's final argument is that her discussion with Gordon was insufficient to justify her termination. She argues that Extendicare has a "progressive discipline policy" whose purpose is to "correct improper employee behavior by the use of the least severe penalty possible." She acknowledges that the Employee Handbook classifies offenses by severity, but argues (without citing to the record) that Eiswerth and Jones "tailored Ms. Heine's 'crime' to achieve their intended punishment."

The Employee Handbook does employ a progressive discipline policy for some offenses. For example, the first violation of a Category I offense is met with a "first notice." The second and third violations are met with second and third notices, the fourth violation leads to a discharge warning, and the fifth violation leads to a discharge. Category II offenses follow a similar scheme, except that it only takes three Category II violations to generate a discharge. In contrast, Category III offenses are not progressive. The Employee Handbook allows for discharge for a single Category III violation. But even if Heine had simply been gossiping, rather than revealing confidential information, she had been warned against such behavior numerous times.

There is ample support for defendants' decision to terminate Heine, and the district court correctly concluded that she was unable to establish a genuine issue of material fact as to whether

the explanation for her termination was pretextual. For this reason, we affirm the grant of summary

judgment for defendants regarding Heine's retaliation claim.

VI.

Reynolds and Heine have appealed the district court's grant of summary judgment on their

common law promissory estoppel claim. Ohio adopted the elements of promissory estoppel as

described in the RESTATEMENT (SECOND) OF CONTRACTS § 90. *See The Limited Stores, Inc. v. Pan*

*American World Airways, Inc.*, 600 N.E.2d 1027, 1031 (Ohio 1992); *R.P. Carbone Constr. Co. v.*

*N. Coast Concrete, Inc.*, 624 N.E.2d 326, 327 (Ohio Ct. App. 1993). The Restatement defines

promissory estoppel as:

> A promise which the promisor should reasonably expect to induce action or
> forbearance on the part of the promisee or a third person and which does induce such
> action or forbearance is binding if injustice can be avoided only by enforcement of
> the promise.

RESTATEMENT (SECOND) OF CONTRACTS § 90(1).

Plaintiffs' relevant argument is that the Employee Handbook promises that they would not

be retaliated against for reporting offensive conduct. In order to succeed on this claim, plaintiffs

need to establish that defendants retaliated against them in violation of this promise. Their brief

recognizes this limitation and argues that, "to the extent this Court reverses the district court's ruling

on Ms. Reynolds and Ms. Heine's retaliations claims, it similarly should reverse the Court's grant

of summary judgment on their claim of promissory estoppel."

Defendants cite several cases holding that provisions of an employee handbook do not

constitute specific promises for the purposes of promissory estoppel. Defendants' arguments are

persuasive, but we do not need to reach them. Even if plaintiffs could have reasonably relied upon the statements in the Employee Handbook, they cannot prevail with their promissory estoppel claim without showing that they were retaliated against, and for the reasons explained above, they cannot succeed with such an argument. We affirm the district court's grant of summary judgment for defendants regarding plaintiffs' promissory estoppel claims.

## VII.

For the reasons stated herein, we affirm the judgment of the district court.