RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0409P (6th Cir.)
File Name: 02a0409p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

CLEVELAND BROWN,
    *Plaintiff-Appellant,*

    *v.*

MICHAEL J. CROWLEY, et al.,
    *Defendants-Appellees.*

No. 01-1541

Appeal from the United States District Court
for the Western District of Michigan at Marquette.
No. 98-00122—Robert Holmes Bell, Chief District Judge.

Submitted: August 7, 2002

Decided and Filed: November 27, 2002

Before: MOORE and GILMAN, Circuit Judges; ROSEN,
District Judge.[*]

_____

**COUNSEL**

**ON BRIEF:** Patrick J. Wright, OFFICE OF THE
ATTORNEY GENERAL, CORRECTIONS DIVISION,

_____

[*] The Honorable Gerald E. Rosen, United States District Judge for the
Eastern District of Michigan, sitting by designation.

1

Lansing, Michigan, for Appellee. Cleveland Brown, Ionia, Michigan, pro se.

GILMAN, J., delivered the opinion of the court, in which MOORE, J., joined. ROSEN, D. J. (pp. 18-46), delivered a separate dissenting opinion.

————————

**OPINION**

————————

RONALD LEE GILMAN, Circuit Judge. After Cleveland Brown, a Michigan prisoner, was transferred from one prison to another, he was informed that he owed a balance on his personal account with the former prison. Funds were then removed from Brown's prison trust account to cover the debt. Yet when Brown was subsequently transferred to other Michigan prisons in later years, he continued to receive notices regarding the same debt. Brown attempted to rectify the situation by filing grievances each time he received a notice, but his efforts were unsuccessful. He finally wrote a Michigan State Police official to request that criminal charges be brought against various prison officials for embezzlement of his funds. His request was referred to the Internal Affairs Department of the Michigan Department of Corrections (MDOC), which decided that his complaint was meritless. Brown was subsequently issued a major misconduct charge for filing a false complaint. He was later acquitted of the charge by a hearing officer.

In June of 1998, Brown filed suit against a number of MDOC officials pursuant to 42 U.S.C. § 1983. Brown claimed that the defendants violated his constitutional rights under the Equal Protection Clause, the Due Process Clause, the First Amendment, and the Eighth Amendment. The district court dismissed several of Brown's claims sua sponte, and the defendants were later granted summary judgment on the remaining claims. This court, in a prior appeal, vacated the district court's dismissal of Brown's retaliation claim and remanded for further proceedings. On remand, the district

assess the veracity of the parties' respective beliefs that Brown's prison account was or was not overcharged by a few dollars. I believe that the majority's ruling fails, on a number of levels, to apply the proper standards for evaluating Brown's claim of First Amendment retaliation, and I accordingly dissent.

court granted the defendants' motion for summary judgment on the retaliation claim. For the reasons set forth below, we **VACATE** the judgment of the district court and **REMAND** the case once again for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Factual background

In February of 1995, Brown was transferred from Ryan Correctional Facility (Ryan) to the Marquette Branch Prison (Marquette). Brown was later informed that Ryan had sent a notice to Marquette stating that he owed $51.24. After concluding that Brown did in fact owe the $51.24, Marquette Business Office Secretary Susan Bianchi requested Marquette Accountant S. Laine to deduct that amount from Brown's prison trust account. Bianchi subsequently told Brown that the debt had been paid.

Brown was later charged an additional $18.00 for a debt that he allegedly owed to Southern Michigan Prison. He contends, however, that this amount had already been included in the $51.24 that was paid to Ryan. When Brown questioned the debt, Bianchi informed him that the $18.00 debt was part of a different transaction.

After Brown's attempts to obtain records pertaining to his Ryan debt were unsuccessful, he filed a grievance. Brown's grievance was answered by the grievance coordinator at Ryan, Cindy Thorton. Thorton stated that, of the $51.24 paid to Ryan, $4.91 was for an indigent loan, and the remaining $46.33 was the amount that had been overdrawn from Brown's prison account.

Brown was subsequently transferred from Marquette to Standish Maximum Correctional Facility (Standish). When Brown received a second notice regarding the $18.00 debt, he filed a grievance requesting an itemized statement of the amount owed. At Standish, Brown also continued to receive

notices that he owed the $51.24 debt that had been paid while he was imprisoned at Marquette.

Brown was then transferred once again, this time from Standish to Baraga Maximum Correctional Facility (Baraga). After he was transferred, the Baraga accounting office informed Brown that Ryan was still claiming that he owed $51.24. In January of 1998, Brown filed still another grievance and wrote to Baraga Case Manager Daniel Lesatz regarding the situation. A few days later he wrote a second letter to Lesatz. He also wrote contemporaneous letters regarding the matter to Baraga Accountant Toni Joki and Baraga Warden Michael Crowley. Two days later, he sent copies of the pertinent records to Baraga Resident Unit Manager William Leutzow to try to resolve the matter. Leutzow, however, returned these documents to Brown and told him that he should contact Ryan directly.

Lesatz later denied Brown's January 1998 grievance on the basis that it was duplicative of grievances that Brown had filed in 1996 and 1997. This caused Brown to send a Step II grievance appeal to Baraga Warden Crowley, contending that his grievance was not redundant because a duplicate deduction had been made from his prison account. After the matter was investigated, Crowley told Brown that the $51.24 debt had been reduced to $6.16, and that the matter would be resolved when that amount was paid. Although Brown requested copies of the investigation reports, he never received a response. Brown then sent a Step III grievance appeal to MDOC Director Kenneth McGinnis, but his appeal was denied.

At this point, Brown wrote Michigan State Police Lieutenant Colonel Alan K. Anderson to request that criminal charges be brought against the above-mentioned prison officials for embezzlement of his funds. Anderson submitted the matter to the Internal Affairs Department of the MDOC. Brown subsequently received a letter from MDOC Internal Affairs Manager Jack L. Hall, stating that his complaint had been investigated and that it lacked merit.

U.S.C. § 1915(e)(2)(B), to name just two — that enable us to quickly dispose of frivolous claims and sanction those who bring them. If a litigant believes we are wrong in taking such action, his sole recourse is to appeal. The judge-made doctrine of judicial immunity protects us from an award of damages, or even discovery on allegations of bad faith or malice. *See Barrett v. Harrington*, 130 F.3d 246, 254-55 (6th Cir. 1997), *cert. denied*, 523 U.S. 1075 (1998).

If we enjoy such immunity in our rather rarefied setting, I think it only fair that we grant some degree of deference to prison officials who make similar determinations under much more trying and turbulent circumstances. The qualified immunity doctrine seeks to account for these circumstances, yet we inexplicably refuse to apply it in this case. Worse, the majority determines on the merits that an administrative reversal of a misconduct charge, standing alone, raises a triable issue of fact on any unlawful motive the prisoner might care to suggest as the basis for the charge. Under this rule, a prison official who believes that an inmate has filed a false complaint had better be right, and able to prove it to the satisfaction of an administrative hearing officer, on pain of discovery, trial, and exposure to a money judgment.[13]

This would be bad policy, but is even more untenable as a rule of constitutional law. The facts of this case make this clear, where the majority has found that a trial is necessary to

---

[13]By dismissing this as a "parade of horribles," (Majority Op. at 14), the majority presumably means to suggest that I am conjuring up a mere theoretical possibility that is unlikely to occur with any frequency, if at all. Yet, this very case features precisely the "horribles" with which I am concerned — namely, lengthy proceedings and a trial based solely upon Defendants' failure to persuade a hearing officer that Brown had engaged in misconduct. Moreover, unless we are prepared to believe that prisoners exercise more restraint in their filing of internal grievances than in their pursuit of civil litigation, or unless subsequent panels are able to identify limiting principles in the majority opinion that I have failed to discern, it seems clear to me that today's decision kicks off a veritable "parade" of similarly unsubstantiated First Amendment retaliation claims that nonetheless survive summary judgment.

scholars as evaluated by the courts in hindsight, rather than their motives being assessed by what they actually said and believed at the time they acted. I am simply at a loss to understand why the majority deems it necessary to analyze a prisoner's First Amendment retaliation claim under a special set of standards wholly different from those we routinely apply in cases involving allegations of impermissible motive. Under these latter principles, which we have repeatedly stated and applied in our decisions, it is clear that Brown suffered no adverse effects whatsoever for the few short days that the misconduct charge was pending against him. In addition, Defendants have produced evidence that they charged Brown with misconduct for a permissible, non-retaliatory reason, and Brown has produced no evidence that this reason was pretextual, much less that the true reason was retaliatory. On these grounds, most of which were recognized by the Magistrate Judge in the very early days of this case, (*see* July 30, 1999 Report and Recommendation at 18), we should affirm the District Court's award of summary judgment in Defendants' favor.

## IV.

Defendants tell us that Michigan prisoners file thousands of grievances each year. It seems safe to assume that at least some of these are frivolous or outright false, and that substantial state resources are wasted in processing such complaints. Moreover, as we recognize the danger that a prison official might use a misconduct charge as a means of retaliating against an inmate, we surely must acknowledge that a prisoner, likewise, might lodge retaliatory charges against prison staff, with the result that personnel are diverted from their usual tasks to address these charges, at considerable expense to the taxpayers. It stands to reason, then, that prison officials must be given the tools to deter such complaints, including the authority to take disciplinary action against inmates who file them.

As judges, we surely must appreciate this. We have a panoply of tools at our disposal — Fed. R. Civ. P. 11 and 28

In April of 1998, Regional Prison Administrator Richard E. Johnson wrote a letter to Warden Crowley to request that Brown be issued a major misconduct charge for filing a false complaint. At Crowley's direction, Case Manager Lesatz then issued the charge against Brown for "interference with the administration of rules." The misconduct charge stated that an investigation had determined that Brown still had an outstanding debt. Because Brown was already being housed in administrative segregation, no further restrictions were imposed on him as a result of the misconduct charge.

After a hearing, Brown was found "not guilty" of the charge. The hearing officer concluded that the evidence was insufficient to show that Brown had deliberately filed false allegations. Furthermore, the hearing officer concluded that Brown's belief that someone was improperly taking money from his account was not unreasonable.

### B.   Procedural background

In June of 1998, Brown filed this suit in the United States District Court for the Western District of Michigan against a number of the above-mentioned MDOC officials. Brown claimed that the defendants: (1) discriminated against him because he is African-American, (2) denied him due process by overcharging his prison account for amounts due as he was transferred between different facilities within the Michigan prison system, (3) violated the Eighth Amendment's prohibition against cruel and unusual punishment because he had no money left for basic hygiene products such as shampoo or toothpaste, and (4) impeded his First Amendment rights by denying him contact with his family because he could not afford stamps. Furthermore, in the "statement of facts" appended to his pro se complaint, Brown asserted that the major misconduct charge was issued "in retaliation for seeking to get redress for the (MDOC's) violations of my rights." Brown later filed a motion to amend his complaint to add a number of other defendants.

On August 3, 1998, the magistrate judge to whom Brown's case was referred recommended that his claims be dismissed

for the following reasons: (1) his equal protection claim was frivolous, (2) he had failed to state a due process claim upon which relief could be granted, and (3) he had failed to exhaust his administrative remedies with regard to his First and Eighth Amendment claims. The magistrate judge apparently did not construe Brown's complaint as setting forth a retaliation claim.

On September 1, 1998, Brown filed objections to the magistrate judge's Report and Recommendation. Brown reiterated his retaliation claim in these objections by arguing that the defendants punished him "in violation of the plaintiff's First Amendment right in retaliation for his reporting their actions." On October 5, 1998, the district court approved in part and rejected in part the magistrate judge's Report and Recommendation. The district court dismissed Brown's equal protection and due process claims, but left standing his First and Eighth Amendment claims. Like the magistrate judge, the district court did not directly address Brown's retaliation claim.

The defendants then filed a motion for summary judgment on Brown's remaining claims. In their motion for summary judgment, the defendants requested dismissal of Brown's complaint on the grounds that they were entitled to qualified and Eleventh Amendment immunity. The defendants specifically denied the "apparent retaliatory conspiracy" that Brown claimed had occurred. Brown filed a cross-motion for summary judgment on April 23, 1999, in which he developed his retaliation claim and addressed the defenses that the defendants had asserted.

In his Report and Recommendation dated July 30, 1999, the magistrate judge concluded that the defendants' motion for summary judgment should be granted. The magistrate judge directly addressed Brown's retaliation claim and concluded that Brown "fails to allege any specific facts in support of his claim that the misconduct charge was motivated by retaliatory animus," and that "[t]here is no indication that the misconduct [charge] was motivated by an improper desire to retaliate

effectively decreed that Brown was engaged in protected conduct, the majority suggests, if it does not outright hold, that Defendants' perception of what Brown was doing is legally irrelevant, and that a prisoner's exercise of what we deem after the fact to be "protected conduct" — a definition which apparently encompasses any use of "mere words," no matter how baseless or disruptive to the prison environment[12] — precludes prison officials from taking any action against such conduct, regardless of their motive. Again, one wonders whether Defendants might still be permitted to produce evidence, beyond the unrefuted statements they already have offered, that they acted out of an honest, good-faith and well-founded belief that Brown *had* engaged in the misconduct with which he was charged.

The majority, in short, has reduced *Thaddeus-X* to a single-element test for the existence of protected conduct, with prison officials expected to be unerring First Amendment

---

court proceedings. The Supreme Court has explained, under analogous circumstances, that "an acquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt." *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 361, 104 S. Ct. 1099, 1104 (1984). Here, Brown's administrative acquittal is even less entitled to issue-preclusive effect, given that this case involves both a different standard of proof *and* a shift of the burden of proof to the opposing party, Brown. The hearing report might assist Brown in satisfying this burden, but it surely is not conclusive proof as to the "protected conduct" element of *Thaddeus-X*.

[12]While the majority's "sticks and stones" adage might be good advice on the playground, it has not, so far as I am aware, been adopted into our First Amendment retaliation jurisprudence. Rather, we have consistently held that a prisoner enjoys First Amendment protection only insofar as he pursues nonfrivolous grievances in a manner that does not violate legitimate prison regulations or penological objectives. *See Bell*, 308 F.3d at 607 & n.5; *Smith*, 250 F.3d at 1037; *Herron*, 203 F.3d at 415. The majority's "mere words" formulation, in contrast, lacks any such limiting principles, and seemingly would accord full constitutional protection to a prisoner's grievance threatening, for example, that prison officials would be maimed or killed if they did not return the funds allegedly embezzled from the prisoner's account.

to another, and by the apparent inability of staff at one prison to gain access to the financial records of another MDOC facility. Thus, even if the misconduct charge were construed as resting in part upon Defendants' belief that Brown's claims of overcharges, as well as his claims of embezzlement, were false, I would conclude that this belief, too, would be deemed "honestly held" under the facts available to Defendants at the time. "[W]e do not require that the decisional process used by the [defendant] be optimal or that it left no stone unturned," but rather inquire only "whether the [defendant] made a reasonably informed and considered decision before taking an adverse . . . action." *Smith*, 155 F.3d at 807. The record here, in my view, reveals a more than adequate investigation of Brown's overcharge complaint, particularly given the modest amount at issue.

Unfortunately, this unrefuted evidence of Defendants' permissible, non-retaliatory motive for charging Brown with misconduct plays no role in the majority's analysis of this case. Rather, based solely upon the outcome of the misconduct hearing, the majority moves swiftly and uncritically through the elements of the *Thaddeus-X* standard, coming within a hair's-breadth of awarding summary judgment in Brown's favor, and leaving me — and, no doubt, Defendants and the District Court as well — wondering what sort of additional proof Defendants could possibly offer to avoid this result on remand. The majority declares, for example, that "there was no misconduct" in this case, that Brown filed exclusively "nonfrivolous grievances," and that Brown actually believed that prison officials were embezzling his funds, (*see* Majority Op. at 14), with all of these apparent "findings" derived solely from the report of the hearing officer. Yet, the majority fails to indicate whether Defendants should be permitted to contest any of these points on remand, or whether the statements in the hearing report should instead be accorded the status of irrefutable fact.[11]   Then, having

_____

[11]If the latter, as portions of the majority opinion appear to suggest, then we apparently hold in this case that prison administrative hearings have a greater and more inviolate truthseeking capacity than, say, federal

against plaintiff." On August 30, 1999, the district court adopted the Report and Recommendation and dismissed the case in its entirety.

In August of 2000, this court vacated the district court's dismissal of Brown's retaliation claim and remanded for further proceedings after concluding that Brown had alleged facts sufficient to state a viable claim under the standard set forth in *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). The district court's judgment was affirmed in all other respects. *Brown v. Crowley*, No. 99-2216, 2000 WL 1175615 (6th Cir. Aug. 10, 2000) (unpublished table decision).

After the case was remanded, the two remaining defendants, Warden Crowley and Case Manager Lesatz, filed an answer to Brown's complaint. In their answer, the defendants raised the affirmative defense of "immunity." Brown subsequently filed a motion to amend his complaint to add five defendants. On January 17, 2001, the defendants filed a motion for dismissal or for summary judgment. In their motion, however, the defendants did not argue for dismissal or summary judgment on the ground of qualified immunity.

The magistrate judge recommended that the defendants' motion for summary judgment be granted on the basis that Brown had failed to establish all of the required elements of a retaliation claim. Over Brown's objections, the district court adopted the magistrate judge's Report and Recommendation. Brown's motion to amend his complaint was then denied as moot. Neither the magistrate judge nor the district court addressed the issue of qualified immunity in granting the defendants' motion for summary judgment. This timely appeal followed.

## II.  ANALYSIS

### A.   Retaliation claim

On appeal, Brown argues that the district court erred in granting summary judgment to the defendants on his retaliation claim.   A district court's grant of summary judgment is reviewed de novo. *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000).  Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In considering such a motion, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

This court has held that retaliation against a prisoner based upon his exercise of a constitutional right violates the Constitution.  *Thaddeus-X*, 175 F.3d at 394 (holding that genuine issues of material fact precluded summary judgment on a retaliation claim involving a prisoner's right of access to the courts).  A retaliation claim has three elements:

(1) the plaintiff engaged in protected conduct;
(2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and
(3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Id*. at 394.  If the prisoner is able to prove that his exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct, the burden shifts to the defendant to show that the same action would have been taken even absent the protected conduct.  *Id*. at 399.

Defendants' determination that Brown should be disciplined for making false claims of embezzlement.

This conclusion, however, once again runs afoul of our precedents.  Let us assume, for the moment, that the findings at the misconduct hearing establish that Defendants were mistaken in believing that Brown had made false claims.[10] Even so, in assessing the factual basis for a defendant's action, we do not require that the defendant's belief ultimately prove correct by objective measures, but only that this belief be "honestly held" and reasonably based upon the "particularized facts" before the defendant at the time of the challenged action. *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998).  The rationale behind this variant of the "honest belief" rule is simple:  "If the [defendant] honestly, albeit mistakenly, believes in the non-[retaliatory] reason it relied upon in making its . . . decision, then the [defendant] arguably lacks the necessary [retaliatory] intent." 155 F.3d at 806.

Defendants easily satisfy this standard, and Brown has produced no evidence to suggest otherwise.  As indicated in Johnson's statement and in the misconduct charge itself, Brown's allegations of criminal embezzlement by prison officials were investigated by MDOC's Internal Affairs section and found to be without merit. (*See* J.A. at 200, 204, 205.)  This investigation and its findings provide the requisite "particularized facts" that render Defendants' stated belief "honestly held."  To this day, there are no facts before us that would support a different conclusion.

Even as to Brown's broader and less inflammatory complaint that his prison account had been overcharged, the record reflects that prison officials conducted a diligent investigation of this complaint, but that this effort was made more difficult by Brown's frequent transfers from one facility

---

[10]I again note, however, that nothing in the hearing report or elsewhere in the record calls into question Defendants' determination that Brown's accusations of embezzlement were false.

embezzlement — Brown then "bears the ultimate burden of proving that the proffered reason for the [misconduct charge] was merely a pretext" for retaliation. *Penny*, 128 F.3d at 417.[9] A plaintiff generally establishes pretext through one of three routes, showing either (i) that the defendant's proffered reason has no basis in fact; (ii) that this reason did not actually motivate the defendant's action; or (iii) that this reason was insufficient to motivate the defendant's action. *Weigel*, 302 F.3d at 378.

I have already explained why, in my view, the outcome of the misconduct hearing tells us nothing about Defendants' actual motivation, and the record contains nothing bearing upon the sufficiency of this motivation — Brown has not suggested, for example, that other prisoners have made comparable false complaints yet not been cited for misconduct. This leaves Brown and the majority to rely on the first form of pretext. The majority apparently concludes, again on the basis of the findings at the misconduct hearing, that issues of fact remain as to the factual basis for

---

[9] Alternatively, as suggested earlier, this issue could be framed as an inquiry whether Brown has "produce[d] sufficient evidence from which an inference could be drawn that the adverse action would not have been taken in the absence of the protected conduct." *Weigel v. Baptist Hosp.*, 302 F.3d 367, 381 (6th Cir. 2002) (internal quotations and citation omitted). To the limited extent that the majority opinion alludes to this issue, it improperly shifts the burden of proof from Brown to Defendants. The majority concedes that Johnson's statement and other materials in the record are "relevant" to the question whether Defendants would have taken the same action in the absence of any protected conduct. (Majority Op. at 14.) Yet, despite Defendants' modest burden of production on this point, the majority concludes that Defendants have not "establish[ed] as a matter of law that there was no causal connection between the protected conduct and the adverse action." (*Id.*)

Defendants are not obliged to prove this point. Rather, once they have produced evidence that denies the requisite causal connection — as they undoubtedly have done, through Johnson's statement and otherwise — it is **Brown's** burden to identify evidence that would permit a trier of fact to reject Defendants' stated motive as a mere pretext for unlawful retaliation.

The defendants argue that the *Thaddeus-X* standard does not apply to this case because the incidents in question occurred before March 8, 1999, the date on which *Thaddeus-X* was decided. Instead, they maintain that we should apply the "shocks the conscience" standard in analyzing their defense of qualified immunity. Under this standard, the prisoner has to "establish 'an egregious abuse of governmental power' or behavior that 'shocks the conscience'" as a prerequisite to recovery. *Herron v. Harrison*, 203 F.3d 410, 414 (6th Cir. 2000).

We need not address this argument, however, because the defendants did not raise the affirmative defense of qualified immunity in their motion for summary judgment. Although the defendants preserved the defense in their first responsive pleading and in their answer to Brown's complaint, they did not pursue this argument before the district court in the motion for summary judgment that they filed after the case was remanded. The Seventh Circuit has explained that, even if a defendant has "raised" the affirmative defense in a responsive pleading, "the defense of qualified immunity may be deemed as waived if not properly and timely presented before the district court." *Walsh v. Mellas*, 837 F.2d 789, 799 (7th Cir. 1988). "[T]he cases holding that an omission of this character constitutes a waiver of the right to present that issue on appeal are legion." *Id.* at 799-800 ("The mere fact that an obscure reference to [an affirmative defense] is contained in one of the defendants' pleadings does not suffice to preserve that issue for appeal."). We find this reasoning persuasive. *See J.C. Wyckoff & Assocs., Inc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1488 (6th Cir. 1991) ("Issues not presented to the district court but raised for the first time on appeal are not properly before the court."). We will not, therefore, address the defendants' argument that they have qualified immunity from Brown's claim.

On the other hand, as we discuss below, the judgment of the district court must be vacated and the case remanded for further proceedings, because the district court erred in its application of the law to Brown's retaliation claim. The

defendants will thus be free to reassert their immunity defenses in the district court. *See English v. Dyke*, 23 F.3d 1086, 1090 (6th Cir. 1994) (explaining that a waiver of an official-immunity defense "need not waive the defense for all purposes but would generally only waive the defense for the stage at which the defense should have been asserted").

"[E]very consideration that classically supports the law's ordinary remand requirement does so here." *INS v. Ventura*, __ S. Ct. __, No. 02-29, 2002 WL 31444297, at *3 (Nov. 4, 2002) (per curiam) (listing among those considerations the points that the lower-level decisionmaker can "bring its expertise to bear upon the matter; it can evaluate the evidence; it can make an initial determination; and, in doing so, it can, through informed discussion and analysis, help a [higher] court later determine whether its decision" is appropriate). By forcing the defendants to present the qualified immunity defense to the district court in the first instance, we ensure that any future appeal in this case will have the benefit of the district court's analysis of the issues relating to the defense. We are at a disadvantage, generally, when we address on appeal an issue that was so tersely presented to the district court. District courts are far more familiar with the factual record in their cases than are the courts of appeals, and this knowledge can generate useful insights into the issues surrounding qualified immunity. By declining to consider qualified immunity defenses on appeal that were not raised properly before the district court, moreover, we might encourage future defendants to properly raise this defense at the district court level.

The dissent nevertheless laments our restraint in declining to reach the issue of qualified immunity in this particular case, "where this immunity is certain to be conferred upon remand." Dissenting Op. at 20. We do not share the dissent's certainty of outcome. First, it is far from clear that the defendants are correct in urging their entitlement to immunity under the "shocks the conscience" standard. *See Bell v. Johnson*, __ F.3d __, No. 01-1286, 2002 WL 31317957, at *14 (6th Cir. Oct. 17, 2002) ("Thus, after *Gibbs* [*v. Hopkins*,

produced in support of his allegations; or (iii) knowingly and deliberately lodged a false charge against Brown in retaliation for his filing of grievances and complaints against them. Only the last of these hypotheses, of course, would sustain Brown's claim of retaliation, but the trier of fact could not permissibly draw this inference, unless and until presented with evidence that tends to counter Johnson's express and still-unchallenged statement of his lawful, non-retaliatory motive for instructing that Brown be charged with misconduct.

Indeed, the case law demonstrates, in my view, that the hearing officer's findings cannot bear the evidentiary weight that the majority places upon them. In applying the "protected conduct" prong of *Thaddeus-X*, for example, we have explained that a prisoner's claim "need not be successful to be non-frivolous," and that such a claim is protected so long as it is "arguable." *See Bell*, 308 F.3d at 607 n.5 (citing *Lewis v. Casey*, 518 U.S. 343, 352-53 & nn.2, 3, 116 S. Ct. 2174, 2180-81 & nn.2, 3 (1996)). By the same logic, the hearing officer's dismissal of Brown's misconduct charge after a hearing on the merits says nothing about whether the charge had arguable merit, was frivolous, or was brought in bad faith, particularly given the hearing officer's application of an elevated standard of proof in adjudicating the charge. Though it might well be ***necessary*** to Brown's claim of retaliation that he secure the administrative reversal of the misconduct charge, *see, e.g.*, *Cowans v. Warren*, 150 F.3d 910, 912 (8th Cir. 1998); *Jackson-El v. Winsor*, 986 F. Supp. 440, 444-46 (E.D. Mich. 1997), *aff'd*, 201 F.3d 440 (6th Cir. 1999), this alone is not ***sufficient*** to raise a triable issue of fact as to Defendants' motives for issuing the charge.

Rather, I believe that this inquiry is governed by the traditional standards, firmly established in our employment law decisions, for analyzing disputes over a defendant's stated reasons for taking a particular action. Defendants having identified a lawful, non-retaliatory ground for the misconduct charge — namely, their determination, following an investigation, that Brown had asserted false claims of

judgment law, of course, that Brown cannot "rely on the hope that the trier of fact will disbelieve" Johnson's account, but "must present affirmative evidence" of a retaliatory motive. *See Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (internal quotations and citations omitted).

The *only* possible candidate for such "affirmative evidence" that I can discern from the majority opinion, or from the record as a whole, is the determination of the hearing officer that Brown's misconduct charge should be set aside. In particular, the majority quotes the hearing officer's findings that Brown was "not unreasonable" in believing that his prison debt had already been paid, and that Brown probably "did legit[i]mately think [that] someone was taking his money and . . . that his alle[g]ations were not false." (J.A. at 201.) The entire focus of the hearing officer's inquiry, however, was whether **Brown** "deliberately and intentionally filed a false claim with the specific purpose of misleading" prison officials or "having staff disciplined." (*Id.*)

The hearing report, consequently, seems a poor place to look for evidence of ***Defendants'*** motivation in charging Brown with misconduct. The most that can be said from this document is that Defendants failed to prove — to the satisfaction of the hearing officer, at least, and under the "higher burden of proof" imposed by the officer, (*id.*) — that Brown had intentionally filed a false claim for an improper purpose. This says nothing about *why* Defendants accused Brown of this misconduct in the first instance. From the hearing report alone, one could equally well speculate, for example, that Defendants (i) honestly believed, after a thorough investigation, that Brown's allegations of embezzlement were knowingly false; (ii) arrived at this belief only through a careless disregard for the records Brown had

---

whether the evidentiary record, viewed most favorably to Brown, would enable him to meet his burden of establishing that Defendants charged him with misconduct, not for the reason stated by Johnson, but rather in retaliation against his exercise of First Amendment rights. *See Penny v. United Parcel Service*, 128 F.3d 408, 417 (6th Cir. 1997).

10 F.3d 373 (6th Cir. 1993),] we think it clear that an inmate's First Amendment retaliation claim would be assessed according to the same standards applied to such claims in the other contexts, rather than the 'shock the conscience' standard applicable to substantive due process claims."). Even applying the standard urged by the defendants, moreover, this court has held that a plaintiff inmate alleged facts showing a conscience-shocking abuse of power where he asserted that prison guards maliciously filed false disciplinary charges against him in retaliation for the exercise of his First Amendment rights. *Cale v. Johnson*, 861 F.2d 943, 950 (6th Cir. 1988). Brown has alleged certain similar circumstances in this case. In short, it is far from a foregone conclusion that the defendants will be entitled to qualified immunity upon remand.

We will now proceed to determine whether the defendants are entitled to summary judgment by applying the standard that this court announced in *Thaddeus-X*. The defendants concede that Brown was engaged in protected conduct when he complained about the alleged overcharges to his prison account. Brown has thus established the first element of a retaliation claim.

Under *Thaddeus-X*, the second element requires proof of an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct. This court has explained that "while certain threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations, this threshold is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment." *Thaddeus-X*, 175 F.3d at 398.

The defendants acknowledge that prisoners who are subject to a major misconduct charge are generally transferred to administrative segregation, and that this court has concluded that placing a prisoner in administrative segregation is an adverse action. *Herron*, 203 F.3d at 416 (holding that being sentenced to five days of administrative segregation

constitutes an adverse action); *Thaddeus-X*, 175 F.3d at 396 ("In the prison context, an action comparable to transfer to administrative segregation would certainly be adverse."). They point out, however, that Brown was already in administrative segregation when he was issued the major misconduct charge. The defendants therefore contend that he did not suffer an adverse action.

Although Brown was already in administrative segregation and a hearing officer ultimately found him not guilty, the issuance of the major misconduct charge subjected him to the risk of significant sanctions. Mich. Admin. Code R. 791.5505(1) (listing the sanctions that a hearing officer is allowed to impose on a prisoner who is found guilty of major misconduct). Brown, for example, could have been sentenced to "punitive segregation" if he had been found guilty, a sanction more severe than administrative segregation. *Id*.; Mich. Admin. Code R. 791.5510 (describing punitive segregation). He also could have lost good-time or disciplinary credits, effectively increasing the amount of remaining time that he was required to serve. Mich. Comp. Laws § 800.33(5); Mich. Admin. Code R. 791.5505(3)(b). A reasonable jury could conclude that being subjected to the risk of such severe sanctions for raising a legitimate complaint "would deter a person of ordinary firmness from continuing to engage in that [protected] conduct." *Thaddeus-X*, 175 F.3d at 394; *see also Cale*, 861 F.2d at 949-50 (recognizing the § 1983 claim of an inmate in part because "in this case appellant was *in danger of* further loss of liberty through disciplinary detention and through the loss of good-time credit as the result of the charges filed against him") (emphasis added).

The third element of a retaliation claim is a causal connection between the protected conduct and the adverse action. This element is satisfied where "the adverse action was motivated at least in part by the plaintiff's protected conduct." *Id*. at 394. "Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the

---

frivolous complaint or who exercises his right to file grievances in a manner that violates legitimate prison regulations and objectives is not engaged in protected activity, and a prison official does not unlawfully retaliate by taking action against such unprotected conduct. *See Smith*, 250 F.3d at 1037; *Herron*, 203 F.3d at 415. Johnson's stated motive is precisely this permissible one — and, indeed, he recognized that it would not be appropriate to take action against a legitimate grievance. On its face, then, Johnson's statement ***breaks*** the relevant causal connection, rather than serving as evidence of it as the majority holds. In other words, Johnson's statement indicates that he could not possibly be acting with the impermissible motive of retaliating against Brown's exercise of First Amendment rights because, in Johnson's view, Brown was not even ***engaged*** in protected conduct when he accused prison officials of embezzlement.

Hence, in order to survive summary judgment on the "causal connection" element of the *Thaddeus-X* standard, Brown must identify a genuine issue of fact as to whether Defendants were motivated, at least in part, by Brown's protected conduct. Brown must make this showing, moreover, in the face of Johnson's express contemporaneous statement that he was ***not*** so motivated, but instead directed that Brown be charged with misconduct for engaging in ***unprotected*** activity that was disruptive to the orderly operation of the prison.[8] It is a familiar principle of summary

---

[8]It is immaterial, in my judgment, whether one considers Johnson's statement as part of the "causal connection" inquiry, or instead views this statement as bearing upon Defendants' burden of production once Brown has established the three elements of a *prima facie* case of retaliation. Assuming that Brown has made out a *prima facie* case, Defendants then would have to produce evidence that they would have issued the misconduct ticket even in the absence of Brown's protected activity. *See Thaddeus-X*, 175 F.3d at 399. Johnson's statement satisfies this burden of production — as noted, he stated his belief that Brown was not engaged in protected conduct, making it clear that he would have pursued precisely the same course of action even "in the absence of" any protected conduct. At this point, having negotiated our way through the initial burden-shifting framework, we would return to the overarching question

My strongest point of disagreement with the majority, however, concerns its application of the third, "causal connection" element of the *Thaddeus-X* test to the facts of this case. Having seemingly determined that all of Brown's grievance-related activity is protected conduct, the majority has no difficulty in concluding that the major misconduct charge was causally related to this conduct. And, indeed, the record is clear on this issue, at least as the majority has framed it. Following an Internal Affairs investigation which determined that Brown's allegations of embezzlement were "without merit," Regional Prison Administrator Richard Johnson requested that a misconduct ticket be issued against Brown:

> We have been seeing more and more of these false complaints lately. While I believe a prisoner should be able to file a legitimate complaint, they also should be punished for filing false complaints. Therefore, please issue a major misconduct ticket to the prisoner regarding this matter.

(J.A. at 204.) I wholeheartedly agree with the majority that Johnson's statement expressly links the misconduct charge to Brown's prior grievances and complaints to public officials concerning the funds in his prison account.

Contrary to the majority's reasoning, however, this is only the beginning of the "causal connection" analysis, and not the end. ***Any time*** a prison official charges an inmate with misconduct for filing a false complaint, there is an undeniable causal link between the prisoner's complaint and the misconduct charge. Yet, the relevant consideration, as always in retaliation cases, is "the subjective motivation of the decisionmaker" — "that is, the plaintiff must show that the decision was motivated, at least in part, by the plaintiff's protected activity." *Smith*, 250 F.3d at 1038.

Taking Richard Johnson at his word, this motivation is lacking here. Johnson requested that a misconduct ticket be issued in light of Brown's "false complaint[]" of embezzlement. As explained earlier, a prisoner who files a

defendant." *Id*. at 399. In order to prevail on summary judgment, the defendant must then "show that he would have taken the same action in the absence of the protected activity." *Id*.

The record in the present case establishes that Regional Prison Administrator Johnson sent a memorandum to Warden Crowley directly linking the major misconduct charge to Brown's protected conduct. After that memorandum was received, the major misconduct charge was issued, despite the fact that prison officials were aware that an accounting problem existed regarding Brown's prison account and that Brown might have a valid complaint. In finding Brown not guilty of the misconduct charge, the hearing officer stated:

> I find that, based on the documents that prisoner did submit at this hearing that his perception that his debt is paid off is not unreasonable at all. Prisoner even states in his complaints that he has grieved that matter and spoken with staff several tiomes [sic] about this matter in an effort to show that he has [] paid his debt in full and even shown them the documents that he showed this hearing officer. Hearing officer finds that it is entirely reasonable and probable that prisoner did legitimately think someone was taking his money and that prisoner had a reasonable belief that his alleations [sic] were not false.

Based upon this evidence, we conclude that a reasonable jury could find that Brown has established that the defendants' adverse action was motivated at least in part by his protected conduct. The burden of production therefore shifts to the defendants.

In holding that Brown failed to establish the third element of a retaliation claim, the district court emphasized that the defendants presented evidence that they had issued Brown a major misconduct charge only after investigating his allegation and concluding that it was meritless. The district court thus concluded that "[i]t is clear that defendants issued the misconduct ticket solely because they believed plaintiff

acted improperly and made false allegations." Although the evidence presented by the defendants is relevant to the question of whether they "would have taken the same action in the absence of the protected activity," it is not sufficient to establish as a matter of law that there was no causal connection between the protected conduct and the adverse action. The district court therefore erred in concluding that no genuine issue of material fact exists regarding the third element of Brown's retaliation claim.

A classic "parade of horribles" is presented by the dissent because of our conclusion, which supposedly "will result in strict liability—or at least a triable factual issue—whenever a prison official cites a prisoner for misconduct and the charge is subsequently set aside." Dissenting Op. at 18. What this critique misses is that we are here concerned with allegations of prison officials retaliating against an inmate for the exercise of his First Amendment rights, not with prisoner misconduct generally. *Cf. Wright v. Newsome*, 795 F.2d 964, 968 (11th Cir. 1986) (concluding that the plaintiff inmate had "alleged facts bringing actions that might not otherwise be offensive to the Constitution, such as the search itself or the confiscation and destruction of [legal and] nonlegal materials . . . , within the scope of the Constitution by alleging that the actions were taken in retaliation for filing lawsuits and administrative grievances").

The dissent contends that "a prison official does not abuse his position of authority merely by invoking a conventional administrative procedure for sanctioning prisoner misconduct." Dissenting Op. at 27. This is accurate as a general statement of the law, but it has little application to the facts of this case, where there was no misconduct. All Brown did was file nonfrivolous grievances and write a letter to the police asking them to investigate prison officials for embezzlement when, according to the hearing officer, he "did legitimately think someone was taking his money." On the facts as alleged by the plaintiff, the defendants and the dissent seem to have forgotten the childhood doggerel that "sticks and stones will break my bones, but words will never hurt

*Univ.*, 185 F.3d 542, 545-46 (6th Cir. 1999), *cert. denied*, 529 U.S. 1019 (2000); the temporary loss of a position, *see Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461-62 (6th Cir. 2000); a short-term suspension with pay, *see Jackson*, 194 F.3d at 744, 752; or allegedly unjustified disciplinary measures, such as "counseling memoranda," that have no material effect upon the terms and conditions of the plaintiff's employment, *see Allen v. Michigan Dep't of Corrections*, 165 F.3d 405, 408, 410, 413 (6th Cir. 1999); *Walborn v. Erie County Care Facility*, 150 F.3d 584, 590 (6th Cir. 1998). One of our observations in *Dobbs-Weinstein* applies with full force here — that, if we were to accord "adverse" status to interim decisions that are subject to further internal review, the result "would be to encourage litigation before the [defendant] has an opportunity to correct through internal grievance procedures any wrong it may have committed." *Dobbs-Weinstein*, 185 F.3d at 546.

The *Thaddeus-X* standard expressly derives from this body of employment law. *See Thaddeus-X*, 175 F.3d at 388-90, 394. Yet, we recognized that, in light of the paramount concern for "[s]afety and order" in the prison setting, "[a] prisoner's First Amendment rights are not more extensive than those of a government employee; in fact, under most clauses of the First Amendment, they are much more strictly limited." *Thaddeus-X*, 175 F.3d at 392. More specifically, regarding the "adverse action" element of a retaliation claim, we explained that "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before an action taken against them is considered adverse." *Thaddeus-X*, 175 F.3d at 398. It follows, then, that actions the same as or comparable to those we have deemed non-adverse in our employment cases must be non-adverse in the prison context as well. The majority opinion stands this equation on its head, however. I cannot conceive that the average inmate's sensibilities are so delicate and easily offended that a mere risk of disciplinary measures — a stock-in-trade of the prison environment, as I understand it — would deter him or her from filing grievances to challenge perceived wrongdoing.

embezzlement? The majority provides no guidance on these questions, nor does it cite any authority that might assist future courts in determining when a mere "risk" of consequences alone might constitute "adverse action."

My own research has failed to uncover any support for the proposition that a showing of adverse action may rest upon mere potentialities that never come to pass. To the contrary, we have affirmed the dismissal of a First Amendment retaliation claim for lack of any "concrete injuries" suffered by the plaintiff. *Jackson v. City of Columbus*, 194 F.3d 737, 757 (6th Cir. 1999), *overruled on other grounds by Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002); *see also Franco v. Kelly*, 854 F.2d 584, 590 (2d Cir. 1988) (holding that a prisoner would be entitled to relief under a First Amendment retaliation theory if he could "prove his allegation that he was subjected to false disciplinary charges *and subsequent punishment*" as a result of his protected activity (emphasis added)). It is not enough, moreover, that the plaintiff identify a concrete *change* in the conditions of his confinement, if this change is not adverse. We have held, for example, that a lateral transfer from one prison facility to another does not suffice to sustain a retaliation claim, even though this transfer might have "some effect on [the plaintiff prisoner's] future filing of grievances," and even though this transfer might be intended in part "to give prison staff a respite from [the prisoner's] continuous barrage of grievances." *Ward v. Dyke*, 58 F.3d 271, 274-75 (6th Cir.), *cert. denied*, 516 U.S. 991 (1995).

Likewise, in the related context of employment-based retaliation claims, we have required that a plaintiff identify a "materially adverse" effect upon the terms and conditions of his or her employment. *See Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999). We have held that this standard is not satisfied by an interim decision to deny tenure, or even an outright discharge, which is overturned in a subsequent grievance process, and which produces no "final or lasting" harm, *see Virts v. Consolidated Freightways Corp.*, 285 F.3d 508, 522 (6th Cir. 2002); *Dobbs-Weinstein v. Vanderbilt*

me." *Johnson v. Pedersen*, No. 95-C8789, 1986 WL 11023, at *2 (N.D. Ill. Sept. 23, 1986) (holding that prison officials could not disregard a prisoner's due process rights when they punished him for "such a relatively minor offense as swearing").

We are dubious that the issuance of a major misconduct ticket under such circumstances could ever be deemed consistent with First Amendment principles. Prison officials are clearly free to punish inmate conduct that threatens the orderly administration of the prison. But "[t]he State must ensure . . . that [conduct-regulating] portions of the prison rules are not used as a backdoor means of punishing inmates for exercising their right to criticize the legality of officials' actions. Any attempt to use the rules in this manner would result in an unconstitutional application of the rules." *Clarke v. Stalder*, 121 F.3d 222, 230 (5th Cir.), *vacated on other grounds by* 133 F.3d 940 (5th Cir. 1997).

In sum, genuine issues of material fact remain as to whether Brown was subjected to a risk of significant sanctions that would deter a person of ordinary firmness from continuing to engage in protected conduct, and whether the defendants can rebut the causal connection between the two. The district court therefore erred in granting summary judgment to the defendants. Accordingly, the district court's judgment is vacated and the case is remanded for further proceedings. On remand, the district court should also reconsider its order denying Brown's motion to amend his complaint, because that motion is no longer moot.

## B.    Request for a remand to a different district court judge

Brown also requests that we remand this case to a different district court judge, based upon his contention that he "can not and will not receive a fair trial before the current judge." In particular, Brown claims that "[t]he district court seemed to [analyze] everything in favor of the defendants [] and thereby violated the law which states that he is to view the facts in favor of the nonmoving party[]." Brown also

contends that the district court judge "has always been [biased against] the plaintiff's case whenever the plaintiff requested anything from the court."

Although we have the authority pursuant to 28 U.S.C. § 2106 to remand the case to a different district court judge, "this is an extraordinary power and should rarely be invoked . . . ." *Armco, Inc. v. United Steelworkers of Am.*, 280 F.3d 669, 683 (6th Cir. 2002). Because Brown has not submitted any proof of personal bias that would require recusal pursuant to 28 U.S.C. § 144, we have considered the following factors in evaluating his request:

(1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected,
(2) whether reassignment is advisable to preserve the appearance of justice, and
(3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Id*.

None of these factors weigh in favor of remanding the present case to a different district court judge. There is nothing in the record or in Brown's brief to convince us that the district court judge would have difficulty considering the case on remand in an objective manner. Nor is there any reason to think that reassignment is advisable to preserve the appearance of justice. It is therefore unnecessary for a new district court judge to become familiar with the complex factual and procedural history of this case. As a result, we decline to grant the extraordinary relief of remanding this case to a different district court judge.

conditions of his confinement, nor any reduction in privileges; as conceded by the majority, Brown already was in administrative segregation at the time. Neither did the misconduct charge produce any lasting effects upon Brown's prison stay or disciplinary record, as the charge was set aside following a prompt hearing.

*Thaddeus-X* requires that an alleged act of retaliation be truly "adverse," and explains that "certain threats or deprivations are so de minimis," "inconsequential," or "trivial" that they cannot sustain a First Amendment retaliation claim. *Thaddeus-X*, 175 F.3d at 398. In determining whether an action is "adverse," we ask if it would "deter a person of ordinary firmness from the exercise of the right at stake." 175 F.3d at 396 (internal quotations and citation omitted). Where, as here, a challenged action has no consequences whatsoever, either immediate or long-term, it ineluctably follows that such an action is "inconsequential." Nor can it plausibly be argued that the misconduct charge in this case would have chilled the exercise of First Amendment rights; to the contrary, the prompt and favorable disposition of this charge surely would be viewed by a reasonable inmate as vindicating his right to pursue good-faith grievances. Given the context-specific nature of the "adverse action" inquiry, *see Thaddeus-X*, 175 F.3d at 398, I find it unduly myopic to focus solely upon the filing of the misconduct charge in isolation, without regard for the procedural safeguards triggered by this filing and the proper functioning of these safeguards in this case.

More generally, I see no limiting principle whatsoever in the majority's risk-based theory of adverse action. Plainly, this inchoate "risk" of adverse consequences need never be realized, as it was not here. How definite or imminent, then, must a "risk" be in order to satisfy the second prong of *Thaddeus-X*, and how many hypothetical leaps are permissible before a "risk" is deemed inconsequential? Would it have sufficed in this case if Defendants had sent Brown a threatening letter, warning that they would pursue misconduct charges if he made any further allegations of

deal more than merely claim that his account had been overcharged. In particular, Brown wrote to the Michigan State Police and a local prosecutor, demanding that criminal charges of embezzlement be brought against a prison accountant and the prison warden. (*See* J.A. at 206-07.) Even to this day, in his brief in the present appeal, Brown continues to insist that Defendants embezzled funds from his prison account, and he further contends that Defendants falsified documents and lied in order to interfere with any investigation of these criminal charges.

As noted in the misconduct ticket itself, such charges go far beyond mere complaints that Brown had been overcharged for his prison debts. Brown's serious accusations, if accepted, "would ordinarily result in disciplinary actions being initiated against" the accused prison officials. (J.A. at 200.) Yet, an Internal Affairs investigation determined that these allegations of criminal wrongdoing lacked merit, and absolutely nothing in the record suggests that any prison official engaged in criminal conduct of any sort. Even the misconduct hearing report, the centerpiece of Brown's retaliation claim and the majority's analysis, states only that there was insufficient evidence to conclude that Brown "deliberately file[d] false allegations with[] [t]he specific intent of having staff disciplined." (J.A. at 201.) This finding, of course, says little or nothing about whether Brown's allegations of criminal misconduct were ungrounded and frivolous, and hence ineligible for First Amendment protection. It is important to bear this point in mind in analyzing Brown's claim of retaliation.

Turning to the second prong of the *Thaddeus-X* standard, the majority concludes that the mere "risk of significant sanctions," (Majority Op. at 12), without more, constitutes the requisite "adverse action" that permits Brown's retaliation claim to go forward. Indeed, this hypothetical "risk" alone must suffice in this case, because Brown has not identified any actual, concrete consequence of the misconduct charge against him. During the few days that this charge was pending, Brown suffered absolutely no change in the

## III. CONCLUSION

For all of the reasons set forth above, we **VACATE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

————————

**DISSENT**

————————

ROSEN, District Judge, dissenting. The majority decision in this case reaches out to establish a new legal standard in prisoner civil rights actions, announcing law that is wholly advisory and immaterial as to the claim actually before us, yet binds future panels confronted with similar facts. Worse still, the majority seemingly fails to apprehend the true magnitude of its ruling, which will result in strict liability — or at least a triable factual issue — whenever a prison official cites a prisoner for misconduct and the charge subsequently is set aside, even though (i) the prisoner suffers no adverse consequences whatsoever while the charge is pending; (ii) the prisoner is afforded a prompt hearing at which to contest the charge; and (iii) there is no evidence, beyond the bare disposition of the charge itself, that casts doubt upon the prison official's considered judgment that a misconduct citation was warranted. This strict liability standard, in my view, will foster unwarranted and costly federal judicial intervention in the orderly functioning of state prisons, and runs counter to the Supreme Court command that "prison administrators . . . , and not the courts, [are] to make the difficult judgments concerning institutional operations." *Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, 2261 (1987) (internal quotations and citation omitted).

Further, by even reaching the merits of this case, the majority undermines an additional protection designed to shield the actions of state government officials from unwarranted judicial scrutiny — namely, the defense of qualified immunity. Several years ago, just after they were served with prisoner Cleveland Brown's complaint in this § 1983 action, the Defendant/Appellee employees of the Michigan Department of Corrections ("MDOC") promptly asserted qualified immunity in their first responsive pleading, a motion for summary judgment. The Supreme Court has instructed that "qualified immunity questions should be

engaged in protected conduct; (ii) that adverse action was taken against him that "would deter a person of ordinary firmness from continuing to engage in" the protected conduct; and (iii) that there was a causal connection between the protected conduct and the adverse action. *Thaddeus-X*, 175 F.3d at 394. As discussed below, I believe that the record fails as a matter of law to establish the second and third prongs of this standard. More generally, there is no direct evidence of a retaliatory motive for Defendants' conduct, and Brown's evidence does not permit the inference that Defendants acted with such a motive in charging Brown with misconduct. Even by reference to *Thaddeus-X*, then, the District Court properly awarded summary judgment in Defendants' favor.

Before addressing my principal points of disagreement with the majority, I first note that the inquiry under the first, "protected conduct" element of *Thaddeus-X* is not quite so clear-cut as the majority seems to believe. The majority has no doubt, and Defendants themselves concede, that Brown was engaged in protected conduct when he complained about alleged overcharges to his prison account. And, to be sure, we have recognized an inmate's "undisputed First Amendment right to file grievances against prison officials on his own behalf." *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000). *Herron* also establishes, however, that this conduct is protected "only if the grievances are not frivolous." *Herron*, 203 F.3d at 415. Similarly, "while a prisoner may have a right to file grievances against prison officials, he or she cannot exercise that right in a manner that violates legitimate prison regulations or penological objectives." *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001).

To the extent that Brown complained about overcharges, it was determined at the subsequent misconduct hearing that Brown's perception on this point was "not unreasonable at all." (J.A. at 201.) This finding, I would agree, raises a triable issue of fact as to whether Brown's complaints on this point were nonfrivolous, and hence protected. What the majority fails to address, however, is that Brown did a good

Cale produced evidence that Wahl actively abused his position of authority, first by instructing another inmate to plant illegal narcotics on Cale, and then by arranging for other prison officials to witness and bring charges for this trumped-up offense.  As noted in Judge Nelson's concurrence, "Wahl surely had no authority to cause illegal drugs to be planted on the person of a prison inmate for any purpose at all, retaliatory or otherwise," and "had absolutely no business trying to make it appear that the inmate was guilty of an infraction of which he was innocent."  *Cale*, 861 F.2d at 951 (Nelson, J., concurring).

The record before us, in contrast, includes no such direct evidence of retaliatory motive.  More importantly, even if such a motive could be inferred from the record — and, as explained below, I do not believe that it can — the evidence does not remotely suggest that Defendants acted upon this purported motive by knowingly manufacturing false charges against Brown.  Rather, the worst that can be said about the misconduct charge in this case is that it was set aside following a prompt hearing.  In the meantime, Brown suffered no ill consequences whatsoever.  If Defendants set about to punish Brown for his exercise of First Amendment rights, they picked a remarkably benign and wholly above-board means of doing so.  Under this record, the District Court surely will determine upon remand that Defendants are entitled to qualified immunity.  There is no reason why we should not make this same determination here and now.

### III.

For the reasons set forth above, I think it irrelevant whether Brown's retaliation claim could survive summary judgment under the analytical framework adopted in *Thaddeus-X*.  Because the majority has weighed in on this issue, however, and has announced new and sweeping legal standards in the process, I find it necessary to state my quite different view of how Brown's claim would fare under *Thaddeus-X*.

*Thaddeus-X* establishes a three-element test for retaliation claims, under which a prisoner must show:  (i) that he

resolved at the earliest possible stage of a litigation," *Anderson v. Creighton*, 483 U.S. 635, 646 n.6, 107 S. Ct. 3034, 3042 n.6 (1987), and has cautioned that the central purpose of qualified immunity — namely, to ensure that government officials need not "stand trial or face the other burdens of litigation" unless "the conduct of which the plaintiff complains violated clearly established law" — is defeated if the courts erroneously withhold such immunity, *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 2815 (1985).  Likewise, this Court has observed that the defense of qualified immunity "not only protects a defendant from liability but may also protect a defendant from the burdens of trial and discovery," *English v. Dyke*, 23 F.3d 1086, 1089 (6th Cir. 1994), and we have deemed it prudent to consider this defense, even if not addressed in the court below, in order to avoid an "unnecessary" remand and "protracted litigation," *Spurlock v. Satterfield*, 167 F.3d 995, 1004 n.16 (6th Cir. 1999).

Nonetheless, despite two rounds of proceedings before the District Court and two appeals to this Court, no consideration has yet been given to Defendants' claim of qualified immunity.  The majority does not question our discretionary authority to reach this issue, and expressly recognizes that Defendants will be free to reassert this defense on remand, a right Defendants surely will exercise.  Yet, the majority does not endeavor to explain what might possibly be gained through further postponement of this inquiry — the District Court previously conferred the entire period of discovery sought by the parties, (*see* J.A. at 340, 343), the record on appeal includes the entire pertinent history of Brown's grievances and their attendant circumstances, the parties have addressed the issue of qualified immunity in papers filed both here and in the court below, and we are in just as good a position as the District Court to decide the purely legal question whether the evidence, viewed most favorably to Brown, could establish a violation of a constitutional right that was clearly established at the time of Defendants' actions, *see Dickerson v. McClellan*, 101 F.3d 1151, 1157-58 (6th Cir. 1996).

The majority's reticence on the defense of qualified immunity is particularly unfortunate here, where this immunity is certain to be conferred upon remand. The majority determines on the merits that the District Court misapplied "the law" governing Brown's First Amendment retaliation claim, (*see* Majority Op. at 9), where the "law" in question is this Court's decision in *Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999). Yet, because *Thaddeus-X* was decided in 1999, nearly a year after the conduct at issue here, the law we announced in that case will have no bearing upon the question before the District Court following our remand of this case — namely, whether Defendants are entitled to qualified immunity under the law as it stood at the time of their actions. This prior law expressly required that Defendants' allegedly retaliatory conduct be "shocking to the conscience." *See*, *e.g.*, *McLaurin v. Cole*, 115 F.3d 408, 410-11 (6th Cir. 1997); *Cale v. Johnson*, 861 F.2d 943, 950-51 (6th Cir. 1988). If it is doubtful, in my judgment, that Brown can satisfy the standard set forth in *Thaddeus-X*, it is plain that he has not identified any conduct that shocks the conscience.

Accordingly, I cannot join in the majority's election to brush aside this simple and wholly ripe issue, and to instead engage in a purely advisory discussion of how *Thaddeus-X* would apply to the facts before us. Through this course of action, we now extend this litigation into its fifth year and third round of District Court proceedings, making the proverbial "federal case" — and one of constitutional dimension, no less — out of what is, at bottom, a bookkeeping dispute over $51.24 in Brown's prison trust account. At the same time, we announce substantive law which, in my view, not only fails to advance this litigation, but promises to produce the wrong result in subsequent cases. For these reasons, I respectfully dissent.

## I.

The majority accurately summarizes the procedural history of this case, and explicitly confirms the crucial point that

pocket. Cale began shouting repeatedly, "You're trying to set me up." Cale was approached by safety and occupational health specialist Harry Farris who placed his hand around the upper portion of Cale's arm to get his attention. Cale stated to Farris, "Oh, I'm glad it's you, Mr. Farris. You are fair. These ____ are trying to set me up." At that time, Wahl shouted at Farris to get the packet from Cale. Farris did not know what Wahl meant by this statement, but Cale threw a piece of paper which was folded in a small square on the top of the main serving line directly in front of Farris. This packet subsequently was determined to contain marijuana. Cale again became very agitated and shouted accusations at Persky.

861 F.2d at 944. Upon arriving at the scene, the duty officer determined that Cale should be charged with possession of narcotics and threatening others with bodily harm. Cale was placed in administrative segregation, until a disciplinary committee determined a few days later that Cale had not violated any of the prison's disciplinary rules.

On this record, we reversed the District Court's award of summary judgment in favor of defendant Wahl. In so ruling, we noted that the "shocks the conscience" standard governed Cale's claim, but found that Cale's evidence, if credited by the trier of fact, would establish the requisite "egregious abuse of governmental power." 861 F.2d at 949-50. Specifically, we held that "the evidence supports a claim that Wahl intentionally and maliciously framed Cale and filed disciplinary charges against him in retaliation for Cale's exercise of his first amendment rights." 861 F.2d at 950.

The distinctions between *Cale* and this case are evident. First, and most obviously, *Cale* features direct evidence of retaliatory conduct, with defendant Wahl explicitly stating, according to one witness, that he would have Cale locked up in order to put an end to his complaints. Next, in going about this stated mission, Wahl did not merely scrutinize Cale's behavior in an effort to identify a punishable offense. Rather,

The record confirms that there was nothing remotely shocking or abusive in the circumstances surrounding the misconduct charge in this case. The misconduct report was written on April 21, 1998, and Brown was given a hearing just a few days later, on April 30, 1998, after which he was adjudged not guilty of the charge. As noted by the majority, Brown already was in administrative segregation at the time the misconduct was issued, and thus he did not suffer even a temporary deprivation of any privileges for the few days the charge was pending. Morever, as discussed in greater detail below, Brown's claim of retaliation rests solely upon information gleaned from within the four corners of the misconduct charge and hearing report, and not upon any extrinsic evidence from which it might be inferred that Defendants were "out to get him," that they acted maliciously or recklessly, or that the misconduct charge was part of a larger pattern of malfeasance. Under this record, Defendants' conduct could not remotely be characterized as shocking, but rather as utterly benign.

Finally, and by way of contrast, I find it instructive to compare this case with one in which we found that a prison official's alleged act of retaliation *did* constitute an egregious abuse of power. Specifically, in *Cale, supra*, the plaintiff prisoner, Louis Cale, complained about the poor quality of the prison food, and this complaint was relayed to the defendant administrator of food service, James Wahl. A cook foreman testified that he overheard Wahl stating that "he would have Cale locked up and that that would be the end of Cale's complaints," and that Wahl alerted a duty officer to be ready for a call to the dining room at about three o'clock that afternoon. *Cale*, 861 F.2d at 944.

Sure enough, at around 3:00 p.m. that day, the duty officer was summoned to the dining hall to investigate the following incident:

At that time, allegedly under Wahl's direction, inmate Melvin Persky, who worked in the kitchen, approached Cale from behind and placed a small package in his

---

Defendants have preserved their defense of qualified immunity. I write further on this subject, however, to illustrate my belief that any limited "waiver" of this defense in this case is far more attributable to the courts than to Defendants, and hence should be corrected at the earliest opportunity.

Back in January of 1999, a few months after Brown commenced this suit, Defendants moved for summary judgment in their favor, based in part upon the defense of qualified immunity. As noted, this was their first responsive pleading in the case. In a Report and Recommendation ("R & R") dated July 30, 1999, the Magistrate Judge did not address the issue of qualified immunity, but nevertheless recommended that Defendants' motion for summary judgment be granted and that the case be dismissed in its entirety. Regarding Brown's claim that Defendants had retaliated against his exercise of First Amendment rights by citing him for misconduct, the Magistrate thoroughly surveyed the relevant case law, including our then-recent decision in *Thaddeus-X*, and found that Brown had failed to produce any evidence of retaliatory animus that might cast doubt on Defendants' affidavits stating that they had acted in good faith in issuing a misconduct charge. Brown failed to interpose any objections to the R & R,[1] and it was adopted as the opinion of the District Court in an August 30, 1999 Order and Judgment.

Regrettably, when Brown appealed the 1999 judgment, this Court misapprehended the procedural posture of the case. In his initial appellate submission, Brown correctly noted that Defendants had invoked the defense of qualified immunity, and he challenged both the District Court's grant of summary judgment and Defendants' claimed entitlement to qualified

---

[1] The record on appeal includes objections filed by Brown on August 6, 1999, (*see* J.A. at 295), but a review of these objections and the docket reveals that this submission was directed at an earlier R & R, and not the one issued by the Magistrate Judge on July 30, 1999.

immunity.[2]   Nonetheless, a panel of this Court erroneously reviewed Brown's First Amendment retaliation claim as though it had been dismissed as frivolous and for failure to state a claim under 28 U.S.C. § 1915(e)(2)(B).  The panel held that Brown had alleged facts sufficient to state a claim of retaliation under *Thaddeus-X* — a conclusion which, of course, said nothing about the propriety of the District Court's grant of **summary judgment** in Defendants' favor on this claim.  Thus, our initial decision did nothing to advance the resolution of Brown's retaliation claim, but instead tended to muddy the procedural waters.[3]

Upon remand, Defendants filed an answer in which they asserted the affirmative defense of immunity, and the parties sought and were granted a modest period of discovery.  Promptly after the close of discovery, Defendants again moved for summary judgment in their favor on Brown's sole remaining claim of retaliation.  Somewhat predictably, this motion omitted any mention of qualified immunity — after all, the courts had studiously ignored the subject up to that point — and instead drew upon the grounds already identified in the Magistrate Judge's earlier R & R as warranting summary judgment.  Given this prior determination, it should

---

[2]Notably, Brown's initial brief on appeal did not mention any claim of retaliation, but asserted only generally that Defendants had committed First Amendment violations.  It was only in his reply brief that Brown specifically argued that Defendants had attempted to punish him for exercising his First Amendment right to petition for a redress of his grievances. Defendants reasonably could have assumed, then, that Brown had abandoned his retaliation claim on appeal, *see Thaddeus-X*, 175 F.3d at 403 n.18 (stating that an argument "not presented to this court in the initial briefs on appeal . . . is therefore waived"), and this presumably explains why Defendants' response brief in the first appeal did not address this claim.

[3]Although the District Court had not addressed the defense of qualified immunity and Defendants did not identify this issue in their appellate response brief, nothing prevented the panel in the initial appeal from reaching this issue as an alternative ground for affirming the District Court's judgment. *See, e.g., Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000).

Indeed, even without benefit of *McLaurin*'s guidance, this conclusion would be unassailable.  Under anything but the most extraordinary of circumstances, a prison official does not abuse his position of authority merely by invoking a conventional administrative procedure for sanctioning prisoner misconduct.  The filing of a misconduct charge, after all, triggers a whole panoply of procedural safeguards, including the entitlements to a prompt evidentiary hearing, to present evidence and arguments, to request a rehearing, and to seek judicial review.  *See* Mich. Comp. Laws §§ 791.252, 791.254, 791.255.  *See generally Copeland v. Machulis*, 57 F.3d 476, 480 (6th Cir. 1995) (holding that this "extensive process provided by Michigan state law" comports with "established constitutional guidelines" for due process).  It seems to me, then, that a prison official's use of this misconduct mechanism is not exactly fraught with potential for abuse, and would not "shock the conscience" absent additional indicia of malice, such as evidence of actual animus, a pattern of repeated filings, or denial of the procedural checks and balances attendant to a misconduct charge.  *Cf. Morissette v. Peters*, 45 F.3d 1119, 1122 (7th Cir. 1995) (holding that there is "no denial of due process" where an erroneous disciplinary charge "is corrected in the administrative appeal process"); *Young v. Hoffman*, 970 F.2d 1154, 1156 (2d Cir. 1992) (same), *cert. denied*, 510 U.S. 837 (1993).[7]

---

[7]Indeed, I would find it ironic if we would, on one hand, recognize a prisoner's constitutional right to file grievances, even those that are determined to be without merit, yet would conclude, on the other hand, that a prison official egregiously abuses his power by invoking a similar administrative mechanism to charge a prisoner with misconduct, at least in those instances where the charge is set aside.  It strikes me that we should encourage prison officials to pursue misconduct charges, as opposed to other forms of discipline that are unaccompanied by similar safeguards.  *See Young*, 970 F.2d at 1156 (observing that, "as a policy matter, this possibility of cure through the administrative appeals process will encourage prison administrators to correct errors as an alternative to forcing inmates to seek relief in state or federal courts").

this case, *McLaurin*'s "shocks the conscience" test governs the second prong of the qualified immunity inquiry.

Our decision in *McLaurin*, under somewhat similar facts, also serves to confirm that Brown cannot hope to demonstrate a violation of this clearly established law. The retaliation claim in that case proceeded to trial, and plaintiff McLaurin testified that defendant Cole had wrongfully issued a groundless misconduct ticket against him, citing him for threatening Cole's life. McLaurin further testified that this ticket was issued solely to retaliate against the grievance he previously had filed against Cole, charging this corrections officer with destruction of the legal materials in McLaurin's prison cell. At the close of this testimony, the District Court entered judgment as a matter of law in Cole's favor, holding that McLaurin had "offered no evidence whatsoever to establish that [Cole's] issuance of the misconduct ticket was an 'egregious abuse of governmental power,'" and that, accepting McLaurin's testimony as true, Cole's "actions d[id] not rise to such a level as to 'shock the conscience' of this court." *McLaurin*, 115 F.3d at 409-10 (quoting District Court order). We affirmed the District Court's judgment on appeal, based in part upon our conclusion that Cole's "actions were not shocking to the conscience." 115 F.3d at 411.[6]

In the present case, Brown's claim of retaliation rests solely upon the major misconduct charge issued against him. *McLaurin* establishes that this does not constitute an "egregious abuse of governmental power" that would "shock the conscience" of this Court. Thus, if Defendants here had reviewed our roughly contemporaneous *McLaurin* decision at the time of the incidents giving rise to Brown's retaliation claim, they doubtless would have concluded that they could issue a misconduct ticket against Brown without fear of being haled into court and accused of violating a clearly established constitutional right.

---

[6] We also concluded that McLaurin had failed to establish a retaliatory motive behind the misconduct ticket, where the record revealed that the prisoner had, in fact, threatened to kill Cole.

come as no surprise that the Magistrate once again recommended that Defendants' motion be granted. This latest R & R was adopted as the opinion of the District Court, and Brown has again appealed. In their current appellate brief, Defendants have raised (for the third time) the defense of qualified immunity, as an alternative basis for affirming the District Court's judgment.

In light of this procedural history, the only sense in which Defendants might be said to have "waived" the defense of qualified immunity is through their failure to rehash the issue before each and every court at each and every available opportunity. Even then, this course of conduct would be wholly understandable, where no court throughout this protracted litigation has yet heeded the Supreme Court's instruction that "qualified immunity questions should be resolved at the earliest possible stage of a litigation," *Anderson*, 483 U.S. at 646 n.6, 107 S. Ct. at 3042 n.6, and where the supposed benefit of this immunity — namely, freedom from the burden of litigating claims not involving a violation of clearly established law — has long since been lost. For whatever reason, the courts cannot seem to resist the allure of measuring Brown's retaliation claim by the standards of *Thaddeus-X*, even though, as discussed below, those standards are exceedingly unlikely to play any role in the ultimate disposition of this case.

Under these circumstances, where Defendants have adequately preserved the defense of qualified immunity, and where we undoubtedly have the authority to reach the issue, "the right question is whether the extent of qualified immunity is ripe for decision." *Buckley v. Fitzsimmons*, 20 F.3d 789, 793 (7th Cir. 1994), *cert. denied*, 513 U.S. 1085 (1995). The answer to this question is clearly yes, in my judgment, and the majority fails to suggest any basis for concluding otherwise. I see no meaningful analytical distinction between the inquiry I advocate and the one the majority conducts — in either case, we survey precisely the same record in exactly the same way (*i.e.,* under summary judgment principles, resolving all factual disputes in Brown's

favor), and ask how Defendants' actions measure up against the relevant legal standard. The only difference is as to the substantive law we would apply: the majority looks to *Thaddeus-X*, while I would consult the law that was clearly established at the time of Defendants' conduct. In other words, the choice is between two purely legal questions, with either to be resolved under the very same record. There is no reason, then, why we should further defer the qualified immunity inquiry, particularly where, as explained below, the issue is readily addressed and the outcome is clear.

## II.

Because Defendants unquestionably have preserved the defense of qualified immunity, we can be sure that they will immediately pursue it again upon remand to the District Court. Regardless of who wins or loses on this issue, an immediate appeal would almost certainly follow. *See Dickerson*, 101 F.3d at 1156-57; *Buckley*, 20 F.3d at 793. The case would return to this Court "like a yo-yo," with "[t]ime . . . lost, and nothing gained, by these additional steps." *Buckley*, 20 F.3d at 793. This process would be particularly wasteful here, as there is no doubt, in my view, that Defendants are entitled to qualified immunity.

In conducting this inquiry, we first ask "whether, based on the applicable law, a constitutional violation occurred," and if so, we then consider "whether this violation involved clearly established constitutional rights of which a reasonable person would have known" at the time of the alleged violation. *Spurlock*, 167 F.3d at 1005 (internal quotations and citations omitted). "Both questions must be answered in the affirmative in order to defeat a government official's claim to qualified immunity," and "the burden is on the plaintiff to allege and prove that the defendant violated a clearly established constitutional right." 167 F.3d at 1005. I will assume, for the moment, that Brown can satisfy the first prong of this inquiry — namely, that he has alleged and can prove

that one or more Defendants retaliated against his exercise of First Amendment rights.[4]

Turning to the second question, it is a simple matter to ascertain the clearly established law that governed Defendants' actions in early 1998. Just a few months earlier, in June of 1997, this Court decided a case where, as here, the plaintiff prisoner, Jack McLaurin, alleged that the defendant corrections officer, Russ Cole, had issued a misconduct ticket in retaliation for a grievance that McLaurin had filed against Cole a few days earlier. *See McLaurin*, 115 F.3d at 409. We squarely rejected McLaurin's contention that his case was not governed by the "shocks the conscience" standard, noting our "repeated[] demand[] that retaliation claims arising from the exercise of First Amendment rights be shocking to the conscience." 115 F.3d at 410.

Our 1999 decision in *Thaddeus-X* confirms this then-existing state of the law, acknowledging that we previously had applied a "shocks the conscience" standard in some instances, and declaring that these prior rulings, including *McLaurin*, are "no longer the law of this Circuit." *Thaddeus-X*, 175 F.3d at 387-88.[5] More recently, though we criticized *McLaurin*'s reading of Sixth Circuit precedent, we nonetheless recognized that, once this 1997 ruling was issued, "a reasonable official might [have] expect[ed] to escape liability for retaliatory acts falling short of conscience-shocking abuses of power." *Bell v. Johnson*, 308 F.3d 594, 612 (6th Cir. 2002). Accordingly, because *Thaddeus-X* had not yet been decided at the time of Defendants' conduct in

---

[4]Upon addressing the merits below, however, I conclude that the evidentiary record fails as a matter of law to sustain this proposition.

[5]The panel in *McLaurin* recognized as much, vacating its decision in light of *Thaddeus-X*. *See McLaurin v. Cole*, 202 F.3d 269, 1999 WL 1206939 (6th Cir. Dec. 9, 1999). Although this vacated decision no longer has precedential value, it plainly still serves as an important datum of this Circuit's law as a government official would have understood it prior to *Thaddeus-X*.